

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-22-00336-CV

———————————————

BOXER PROPERTY MANAGEMENT CORPORATION, Appellant and Appellee

V.

TERESA R. DEHNEL, Appellee and Appellant

---

On Appeal from the 342nd District Court
Tarrant County, Texas
Trial Court No. 342-320239-20

---

Before Birdwell, Womack, and Wallach, JJ.
Memorandum Opinion by Justice Birdwell

## MEMORANDUM OPINION

## I. Introduction

Teresa R. Dehnel sued Boxer Property Management Corporation for age and sex discrimination and retaliation after Boxer fired her. Eleven of twelve jurors answered "no" to the discrimination questions but found that Boxer had fired Dehnel in retaliation for her "opposition to a discriminatory practice"—her discrimination complaints—and awarded to her $87,000 in back pay, $32,000 in noneconomic damages, and $250,000 in exemplary damages. The trial court incorporated the jury's findings into its judgment and added an award to Dehnel of $173,250 in attorney's fees, plus conditional appellate attorney's fees. Both parties have appealed.

In five issues, Boxer complains that there is legally insufficient evidence to support the jury's retaliation finding; that the exemplary-damages award should be reversed because the verdict was not unanimous; that the back pay award should be reversed because the evidence established that Dehnel intended to voluntarily quit the day she was fired; that there is legally insufficient evidence of the nature, duration, or severity of Dehnel's mental anguish or any other noneconomic damages; and that Dehnel's attorney's-fee award is unreasonable. In the sole issue in her cross-appeal, Dehnel asserts that the attorney's-fee award is insufficient when her evidence supported an award in the $519,997 to $866,662.50 range.

Because the evidence is legally sufficient to support the jury's retaliation finding and noneconomic damages award, and because the parties did not try by consent

whether Dehnel's back pay award was precluded, we overrule Boxer's first, third, and fourth issues and affirm these portions of the trial court's judgment. Based on *Oscar Renda Contracting, Inc. v. Bruce*, 689 S.W.3d 305 (Tex. 2024), which issued while this case was pending, we sustain Boxer's second issue, reverse this portion of the judgment, and render a take-nothing judgment on exemplary damages. We also sustain Boxer's fifth issue, reverse the $173,250 attorney's-fee award, and remand it for recalculation in light of the exemplary-damages disposition. Based on our resolution of Boxer's fifth issue, we do not reach Dehnel's sole issue in her cross-appeal.

## II. Background

The evidence presented at trial was voluminous. In the interest of brevity, we will focus on the specific incidents and context that were highlighted during trial, particularly the A/C incident, Dehnel's computer and phone problems, the major-client loss, the office switch, the F-Dex incident, Dehnel's discrimination complaints, the MeetingBroker incident, and Dehnel's termination.

### A. Before the A/C incident (April 30, 2018–October 1, 2018)

Dehnel, who had begun a second career in hotel sales in 2008, started working at Boxer's Holiday Inn (the hotel)[1] on April 30, 2018, when she was in her early fifties. At that time, Dehnel and her supervisor Cara Hayes, the hotel's director of sales (DOS), were the entire sales team because 60% of the hotel's business came from one client

---

[1]The hotel was in the Intercontinental Hotels Group (IHG) franchise.

(an airline) and an additional 10% came from other airlines. At that time, Dehnel and Hayes engaged in "free selling," meaning they could sell any market segment, but Dehnel was hired primarily to "fill in the gap from the airlines" and then to increase catering-and-event-space sales.

Hayes spent a lot of time working out of state at Boxer's other properties. She also ran interference for Dehnel with Bette Gill, Boxer's sixty-year-old corporate director of sales, marketing, and revenue management, to whom each hotel's DOS reported. Hayes stated that Gill, who died of cancer before trial, had disliked Dehnel, although Hayes did not know why.

Mike Owen, the hotel's general manager (GM) since 2014, noted that in the summer of 2018, Gill, who had been concerned with the hotel's continuing decline in food-and-beverage revenue, had some issue with Dehnel over what she was selling or how much she was selling. To further complicate matters, during this time, Boxer was trying to sell off the hotel.

According to Owen, Hayes was responsible for providing performance goals to Dehnel, but Hayes testified that there was nothing specific or in writing as to expected sales. Carmen Castillo, who became DOS after Hayes, testified that when Hayes was her supervisor, she never gave Castillo a specific monthly sales goal, but Tammy Levy, Dehnel's predecessor, testified that Hayes had given her sales goals.

When Hayes was out of state, Dehnel notified Owen when she had to leave early for doctor's appointments, when she needed to look after her mother or her pet, or

4

when there was trouble with the hotel's air conditioning. During that time, their relationship appeared to be positive—on August 3, 2018, Dehnel emailed Owen to invite him to join her and Haley Allen,[2] who also worked in the sales office, for lunch. Dehnel did so again two weeks later. However, things began to change in October 2018.

**B. The A/C incident**

In an email exchange between 3:15 p.m. and 3:24 p.m. on October 1, 2018, Dehnel asked Owen about weekend air-conditioning access, stating that it would be helpful if catering staff could change the temperature upon a guest's request. Owen replied, "The engineer on duty needs to have ability," and Dehnel replied that the engineer did but that a guest had to wait while catering staff found one. She requested a key for catering staff, asking, "It is just a key[,] right?" Owen replied, "No. It is access to website. Have whoever is here have the engineer on duty['s] [B]oxer phone number." Dehnel responded, "They did have it . . . it was the amount of time it took to have it changed. Trying to avoid future guest frustrations." This exchange then led to an in-person disagreement (the A/C incident).

Dehnel testified that she had gone to see Owen because she did not think he had understood her email. As she tried to explain the problem to him, "he came around his desk at [her] like he was going to attack [her], but he was screaming at [her] telling [her], ['D]on't . . . question me and don't give me any lip, do what I'm telling you to do.[']"

---

[2]Because Haley Allen's last name is the same as another employee's first name, we will refer to her by her first name to avoid confusion.

Dehnel said that Haley saw what happened and that Jheromy Jackson, a front desk supervisor, saw the encounter's end.

After she calmed down, Dehnel called Hayes and told her about the encounter. Hayes advised her to contact Boxer's human resources (HR), but Dehnel declined to do so, telling Hayes, "I'm not going to do that, it's a new job, I don't want to lose my job." Dehnel stated that she had been shocked at Owen's reaction to what was "just an air-conditioning question." Hayes described Dehnel as being "very upset" after the A/C incident.

Haley recalled the incident differently. Haley stated that Dehnel had been angry about something and "was kind of mumbling under her breath" before she went into Owen's office. Haley stated,

> Then [Dehnel] sat down in his office, they were talking, and she was getting mad and they were -- I don't know. She was, like, raising her voice. So I could hear more of it, but I wasn't sure what they were saying. And then both of them stood up, and then [Owen] went around the desk to leave on that one side door towards the front office, and then she left on her -- like the glass door. So she left and then she was pretty mad and went to her own desk.

Haley testified that Owen had appeared frustrated and annoyed with Dehnel while Dehnel had "seemed really mad" and that Jackson had not been present.

Jackson, on the other hand, testified that he entered "at the end of it" and saw Owen come around the corner of his desk and come out of his office towards Dehnel "very aggressively." It shocked him because he had never seen Owen behave like that before, and then Owen said something like "[T]hat's it, that's all, I ain't dealing with

6

this anymore." Jackson said that Dehnel had been shaking and upset and that he stayed with her while she calmed down. Jackson said that after the A/C incident, Dehnel and Owen's relationship "definitely got strained." Jackson further testified that after the A/C incident, he heard Owen say on more than one occasion that he would like to shake the hand of the man who would put up with Dehnel. Dehnel testified that Owen often said this to her, but she did not identify when.

Based on their continued exchange of messages, however, Owen and Dehnel were still able to work together after the A/C incident. In January 2019, when Dehnel asked Owen if she could leave early to see an old friend passing through, he replied, "[S]ure." And in February 2019, when she asked him to turn on the air conditioning, he did so.

Other former employees gave positive testimony about Owen. Kristi Meck, who worked at the hotel from June 2019 to January 2020, and whose workstation had been very close to Owen's, testified that she could hear if Owen had someone in his office and that she never heard him yell, raise his voice, or scream at anyone in his office. Levy, Dehnel's predecessor, testified that she had never seen Owen yell, bully, or treat women less favorably than men when she worked at the hotel. At the time of the trial, Levy was working elsewhere as a regional hotel sales director, a position she had secured with Owen's recommendation.

Kimberli Adame, who had worked as a front desk agent, testified that she had never witnessed Owen yell, scream, bully people, or threaten to fire anyone but that she

7

had heard allegations at the time from Dehnel that he was not treating her right and was yelling at her. Adame stated that she saw Dehnel frequently argue with Owen and that it struck her as odd because a subordinate was supposed to respect what the manager said and not scream back at him. Adame said that while she saw Dehnel get angry or frustrated with Owen once, she never saw Owen become overly heated, angry, or frustrated or behave disrespectfully toward Dehnel. Adame said that Dehnel's frustration stemmed from her removal from the sales office next to Owen and her placement in the administration office with Karie Harding, a reservation sales coordinator, at the end of May 2019.

Shelly Campbell, Owen's direct supervisor and Boxer's operations director, testified that she had never seen Owen yell, scream, bully, or belittle Dehnel or anyone else at the hotel and that she had never heard such a complaint from anyone besides Dehnel. Harding, however, testified that Owen had some hearing loss and raised his voice with everyone—women and men, young and old.

## C. Ongoing computer and phone problems

Boxer had its own system of internal computer-based communications—Boxer Central—which was run by its information-technology (IT) team in India; employees were supposed to use Boxer "cases," which were like emails with tracking numbers. Boxer's IT team had also developed a sales-tracking system, Central Sales, to replace Delphi, a system that interfaced directly with IHG's property management system. Central Sales required separate data entry, and the hotel's salespeople were supposed to

enter their numbers into Central Sales weekly. Hayes was working "on tweaking" some of Central Sales's filters when Gill took over the project and ordered Hayes to focus on sales.

Dehnel experienced frequent computer problems. On August 1, 2018, she emailed Owen about one, stating,

> All my documents files are GONE. I have sent a [Boxer] case to Zang Pham[, Boxer's helpdesk operator in Dallas[3]] per [Hayes]. I went to open a[n] email for the Forecast report and my computer both of them went black. When I got back from lunch all of my documents were gone . . . . Contracts, everything . . . . I'm freaking. [Hayes] said there is something going on but I hope [Pham] can fix it. . . . Will you call him since you know him?

Harding testified about Dehnel's disappearing documents, stating,

> I know that when [Dehnel] put information into the system, it would be gone, she would lose all of her information. And I sat and watched her do it. In between five, 10 minutes that I would have here and there, I would be able to watch her put something in, but she's like, I don't know what's wrong with my computer. And I know that she put in . . . [Boxer] Cases . . . for IT to check on her computer, and from -- the IT department said that she needed a new hard drive because that one she had was too old.

Jackson testified that everyone at the hotel had computer problems but that Dehnel's seemed to be consistent and that she "had people in there quite a bit trying to figure out what was going on." He also testified that if he had computer problems, his were fixed that day and that other employees could get a new computer on a day's notice.

---

[3]Dehnel described Pham as "a tech guy."

In June 2019, a day after Dehnel mentioned more computer problems, Owen contacted Pham at 7:57 a.m. about her Boxer case on those problems, noting that "[i]t impacts sales." Pham informed Owen that Boxer's server had been upgraded that week, which had caused some issues. On July 2, 2019, after Owen emailed Dehnel to ask about a projector, Dehnel told him that she would give it to him if he would call Pham and ask him to fix her computer.

Dehnel was not the only employee to experience disappearing documents and other computer problems, but her computer issues were more consistent and not as frequently resolved. At the beginning of July 2019, in an email to Owen in which Betty Jean Larson, Boxer's chief HR officer, was copied, another sales employee, Allen Shahan, whose employment with the hotel began after Dehnel's and was terminated before Dehnel's, noted, "Oddly enough every trace of the argument we had via email is missing . . . ."

In addition to computer problems, Dehnel also experienced phone problems, and both Jackson and Harding testified about problems with Dehnel's office phone. The hotel used an old phone switch system, and there were only two people in North Texas who could repair it; Boxer had a "special deal" with one of them, Harshard Patel. On August 1, 2019—around a week after her first discrimination complaint—Dehnel sent Pham a Boxer case about her continued phone and computer issues and then copied her message into an email to Larson. She noted to Pham that Owen had placed

10

two calls "to a Mr. Patel over the past few months" about the phone with no resolution,[4] and that the problem with her computer was that it was outdated and the only solution was to update it.

Dehnel then sent an email to Larson to let her know that she had copied her on the message to Pham and to explain that she had sent the message directly to Pham instead of Owen "in hopes that [she] could receive assistance." Dehnel stated, "I am a bit disabled in not having a working office phone, skype, cellular and computer issues. Although it appears my computer has been working much better as of late, not perfect but much better—I want to ensure that it will continue to perform." Dehnel expressed her confidence that Pham could fix anything but that she was "not sure if he has the resources he needs to get [her] office phone working." Larson replied the next morning, stating, "I'm sure he can get it working. Let me know if you have any difficulties."

**D. Other employees**

At the end of December 2018, Hayes gave Dehnel an "exceeds expectations" performance review for her first six months. Hayes noted that Dehnel needed to "commit to using [Boxer] cases more frequently to communicate with staff" but also noted that Dehnel completed high-quality work and was dependable, reliable, and punctual. She also noted, "[Dehnel] is not afraid to ask questions or to express ideas and suggestions." Levy, Dehnel's predecessor, had not scored as highly on her January–

---

[4] Owen testified that he became frustrated with Patel's response time because phone repairs were taking too long.

December 2017 performance evaluation, and Hayes had ultimately fired Levy for sending Boxer's proprietary budget information to Levy's personal email address. Hayes stated that she had been the decisionmaker in Levy's termination.

Castillo, who had previously worked at the hotel as a front desk agent, was rehired in January 2019 as a corporate sales manager. Castillo had left the hotel to become DOS at a nearby Holiday Inn Express for ten or eleven months after obtaining the required IHG certificate for that position. After speaking with Boxer's president Michael Pariza at a Christmas party, Castillo interviewed with Owen and Hayes. Boxer had hired Dehnel at an annual salary of $48,000; Castillo was rehired at an annual salary of $54,000. Castillo spoke Spanish, and Dehnel did not.

**E. Major-client loss**

In April 2019, the month in which Dehnel's father died, the hotel was notified that within 30 days, its primary client, Envoy, was going to stop "hard blocking" (guaranteed payment) of 150 rooms per night in the 243-room hotel—the hotel's main revenue source. The next day, Owen requested the sales department's figures and forwarded them to Gill, who questioned their accuracy. Gill noted to Owen and Hayes that the hotel had "fallen extremely short [of] budget for many months now" and that the budget shortfall's "major component [was] the lack of sales contribution and dependency on the airlines to carry the hotel."

Owen and Gill decided to segment sales and to "flood the sales department, get people deployed[,] and give them tasks to go after." However, the record reflects that

12

their goals were hampered by the approvals process, which involved Gill, and about which Dehnel and Hayes both complained, referring to "out-of-house handling" and "gross[] delay[s] under the current[] restrictions." Pariza, Boxer's president, stepped in at one point to tell Dehnel to "immediately involve [him] if there is business stuck in a holding pattern somewhere or any fear of losing business."

In an email at the end of April, Gill expressed her concern to Dehnel and Owen about the low catering numbers, which were far short of what the hotel needed. Owen replied, "I am aware. Will take me a week to get my feet on the ground and clock is ticking on underperformance for all."

Meanwhile, Brian Hill, IHG's franchise performance support manager, and David Brown, another IHG employee, tried to help the hotel with recommendations and various techniques to improve bookings. At the end of May, Owen was given a reminder to set up two presentations showcasing the hotel to the IHG Central Reservations team in Jamaica in August; he decided to send Castillo and Paula Gaitan, who had returned to the hotel at the same time as Castillo and who was being promoted to sales.

## F. The office switch

On May 28, Owen told Dehnel and Harding to exchange offices with Katrina Griffin, the assistant GM, and Gaitan. Griffin and Gaitan had worked in the administration office, where Harding and Dehnel were being relocated from the sales office. Their computers were moved with them. Owen also sent out an email to all

employees about "Changing Times and Roles." Included in this email was information about the upcoming business loss and Hayes's resignation. Owen's email stated, in pertinent part,

> Everyone is aware that we will see a substantial reduction in airline business . . . beginning June 1st.
>
> Because of these changes, we must change also. [Hayes] will be leaving us at the end of this week.[5] . . . The decision has been made for me to oversee the sales effort for Boxer upon her departure. We are currently restructuring the sales department and will be adding more staff to this area. Our goal is to replace our loss in airline business with more business from all segments. I want to share immediate plans with all of you:
>
> . . . Owen-Sales. I will be spending the majority of my time at the hotel, but some at [headquarters] and on sales calls with sales team.
>
> [Griffin]-will be in charge of all hotel operations outside of sales department. . . .
>
> [Castillo]-will be selling corporate LNR and *assist me in running overall sales team*[.] [Emphasis added.]
>
> [Gaitan]-will continue in her current role[] but begin learning sales from [Castillo.]
>
> [Shahan]-corporate group sales/base business[.]
>
> . . . .
>
> [Dehnel]-will be in charge of catering sales/meeting services[.]
>
> [Harding]-will be learning catering sales/meeting services and supporting [Dehnel].

---

[5]Hayes resigned because she was moved from DOS to a position on par with Dehnel and Castillo.

14

I will be having individual conversations with each of you on this email to explain my expectations during these changes. We will adapt. We will have fun. We will be successful.

Dehnel replied to all, "Sounds Great! Let's do this !!!!!"

According to Dehnel, around this time, Owen told her that Griffin, the assistant GM, would be running the banquet event order (BEO) meetings. Hayes testified that she did not see Dehnel at two BEO meetings before May 31 and that when she asked Owen about it, he told her, "This is the way it is, this is how it's going to be" and that he "didn't want any more drama." Harding testified that before the office switch, when she had tried to report an HR concern to Owen, he had accused her of starting drama, and she stated that she had heard him talk about "female drama" all the time. Dehnel testified that she had overheard Owen tell Shahan "about how he liked to hire younger women because they were moldable, they didn't have any opinions[,] and they didn't give any lip action."

Around the same time, Dehnel started seeing a counselor to help with her grief after her father's death. In her counseling intake, she stated, as to her job, that she enjoyed the work but not the "micro managing, the threats to fire staff on a regular basis." A few days later, on June 7, Owen sent Dehnel a lunchtime message to see if she wanted "half of [his] vegan bowl," and she accepted.

Two weeks later, on the evening of June 21, Dehnel informed Owen that they needed to discuss her new assignments and workload. She stated,

15

We need to have a discussion, please. [Castillo] advised me, just today, 6-21-2019—that you had said I would be the one to put in their catering bookings, cases and contracts etc.

There is no way I can manage doing that for two other people as well as myself and still meet the expectations of prospecting and bookings of my own. That is triple the work for me, and ½ the work for 2 others. I am already putting in early mornings, late evenings[,] and weekends.

I would like to meet Monday to review this requirement that I just found out about today.

A few minutes later, she sent him another email to once more advise him that she had experienced computer issues and had sent in a Boxer case.

In response to Dehnel's initial email, Owen told her that he had reviewed the hotel's May profit-and-loss statement and that her assignments were part of his segmentation plan, explaining,

Year to date we are falling 45% short of budget in catering. We are averaging $4K per month in banquet food. That is $133 a day.

My goal is to have rooms sales managers book rooms and catering book catering. Rooms will be handing business to you that will help you make your numbers. It is done to hold individual sales members accountable for their goals. These are not team goals, they are individual. We should review why you are putting in all the extra hours, but catering food is falling so short. . . . I moved [Harding] in with you to learn and support you, because of her load reduction with Envoy. There has to be something I am not understanding.

Dehnel replied that Harding was still working full time on Envoy, and she offered to show Owen "all that is involved from cradle to grave on any one individual booking," which she said took an inordinate amount of time, "[u]nless[] the process for all sales are not the same[,] which then we would need to look at that as well."

16

Fourteen minutes after that response to Owen's email, Dehnel sent an addendum to express her confusion about how bookings were being counted, stating, in pertinent part, "The last we, or rather I[6] was told it was not an individual goal but a group goal. All team members need to have clarification on what they are 'individually' responsible for in both bookings and in managing the data of their accounts . . . ."

Owen replied to Dehnel's "individual goals" email the next morning, reminding her that she had been hired as a catering manager. He stated,

> You were hired as a Catering Manager, so of course your primary responsibility is for catering revenue. *I will take into account lodging revenue you have booked, but I want to be clear with all sales team members that the expectation is they achieve revenue in the area they were hired to do so.* [Emphasis added.]

He told her that Boxer's standards applied to everyone equally and stated, "If anyone on this sales team has an issue with a Boxer Standard for Sales, they should fill out a case with the issue and forward to me."

Owen replied to Dehnel's "cradle-to-grave" email a few minutes later, stating that he had put Harding in the same office with her so that Harding could provide support to her, and he reminded Dehnel to put emails about processes and responsibilities into Boxer cases. Owen stated, "Going forward, if you have any questions or concerns, place in a case and send to me. It is how the system is designed to function."

---

[6]Owen testified that before July 2019, he could sense resistance from Dehnel from her comments like, "[T]hat's not how [Hayes] does it." He stated, "It felt like she was trying to tell me how we should be doing it . . . ."

17

At the end of June, Dehnel sent to Owen her list of confirmed and expected business through year's end, showing one new booking in July and one in September. Owen testified that, assuming Dehnel's numbers were correct, absent Dex (discussed below), her numbers would still have been red flags. He stated that in June 2019, he told Dehnel several times to get her Central Sales and profit-and-loss numbers up and to put her information into Central Sales. Dehnel testified that at the end of June, she was removed or excluded from the daily NETMA[7] meetings. She claimed that Owen told her at first that she could go to the Wednesday NETMA meetings but later told her that there was no reason for her to go at all. Dehnel stated that without the NETMA meetings, she did not know what was going on inside the hotel.

On July 10, 2019, the day after the F-Dex incident described below, Owen did not include Dehnel on an email about a VIP guest from Davaco Corporation that began, "*It is critical that this information is passed along to all of those who possibly come into contact with this guest*." Owen sent the email about the guest—who would have a two-week stay—to Griffin, Jackson, Castillo, Gaitan, Harding, and Meck, as well as the hotel's restaurant manager, chief maintenance engineer, and housekeeping manager.[8] Owen's email contained specific instructions for the guest's

---

[7]NETMA was an acronym for "Nobody Ever Tells Me Anything."

[8]Owen testified that Dehnel was not included on the email because there was no catering expectation for the guest's visit.

transportation, room service, and housekeeping. He made Castillo the guest's direct contact during the stay and stated that he wanted her to join him and the guest for a breakfast, a dinner, or a drink as they tried to win the Davaco contract.[9]

Dehnel testified that she had become isolated not only physically in the administration office but also socially in that if someone went in to talk with her, Griffin would go in, ask that person to leave, and then ask that person what they had talked about.

## G. The F-Dex Incident

In April 2019, Dehnel worked to book DexYP Media, which had previously been a hotel client and which sought to book a block of rooms—but no catering or meeting room rental—for four dates that summer with an anticipated total booking revenue of $68,400. The Dex proposal was approved in May 2019 after some debate. In the Dex Boxer case in which Dehnel, Gill, Hayes, and Owen interacted, Campbell, Owen's supervisor, added the following note: "We have a standard. The standard should be followed. . . . If there are any revisions to be made or ANYTHING additional needed to close this matter, please address accordingly and let's all move forward please."

On June 18, 2019, Owen asked Dehnel if Dex had sent its rooming list, and she replied that she had sent it to him. He asked her to come see him. The same day, at her counseling appointment during lunch, Dehnel told her counselor that there had been

_____

[9]In a July 25, 2019 email to Pariza, Owen reported that Castillo and Gaitan would be taking the guest to a "nice dinner tonight."

19

cuts at work "and [that] she could lose her job." Owen scheduled a "sales blitz" the following week, but Dehnel advised him that she could not attend it because she had Dex scheduled June 25–28, as well as a therapy appointment on June 26, and a hotel client on-site June 27–28. Dehnel commented to him in her email, "Maybe more notice than a few days would be helpful for future."

On July 9, Dehnel created a Boxer case to which she attached the rooming list for Dex's July 17 and July 22 reservations. When Dex's room block was dropped because of a late rooming list, according to Dehnel, Owen went into the office that Dehnel and Harding shared and said, "F[---] Dex," and "I don't care about Dex," in a loud and intimidating way (the F-Dex incident).

Harding confirmed the F-Dex incident but said that the dropped-room situation was resolved within thirty minutes. Owen testified that while he had said "F Dex," he did not say it the way Dehnel and Harding said that he did. Dehnel's counsel stipulated that Owen had a reason to be very angry and frustrated about the room snafu when he said, "F Dex."[10]

---

[10]Owen testified that Dex had been a problem client in the past and then again when Boxer had to write off around $37,000—over half the anticipated contract amount—when Dex did not fill its block (attrition). Owen asked Dehnel about the attrition in a Boxer case on September 4. When Dehnel tried to loop Zain Syed, Boxer's controller, and Pariza into the discussion a week later, Campbell responded to her, stating,

Please go see [Owen] right now and discuss any of your concerns. This is something that does not require [Pariza] nor [Syed] to be involved. These

20

## H. Events leading up to Dehnel's first discrimination complaint

On July 2, 2019, Castillo sent an email to Dehnel and others about a seminar that she had scheduled for the hotel's ballroom on July 13. In her reply the next morning, Dehnel told Castillo that Castillo would have to move part of the seminar because of double-booking. Dehnel chastised her, stating, "I have been requesting copies of your [Booking Event Orders] for the 2 meetings you have for the past 3 weeks. . . . It is imperative that communication and sharing of information is provided to avoid any potential conflicts." In an email a few minutes later, Dehnel added that Castillo should be the one to manage the event because Castillo booked it. Castillo told Dehnel, "I will take care of my meetings, please do not worry."

On July 12, Castillo responded to Dehnel's July 3 email about communication to reiterate that she would take care of her meetings. Dehnel responded, "Let's remove your animosity from the equation and focus on the job(s) at hand. The defensive responses are completely unnecessary and have no merit as I have done nothing less than try to help you." Owen concluded the Dehnel–Castillo email chain by instructing

---

are standard hotel procedural matters that your [GM] has the ability to resolve or guide you through. . . .

[Owen] – please take this from here.

Owen responded in the Boxer case that he had met with Dehnel and stated, "There is no document that shows 'attrition' was waived, but according to [Dehnel], that was the understanding the client had. No attrition has been billed. I will get with [Pariza] to discuss."

them to not send any more emails to each other over the weekend. He told them, "I am going to set up a meeting with all 3 of us and have Shelly [Campbell] attend."

Two days later, Dehnel complained to Owen about Castillo and stated that she welcomed a meeting with Campbell and had "printed all corresponding documentation showing [Dehnel's] well-intended long term efforts to assist [Castillo] in the catering steps for success." Dehnel indicated that she wanted to discuss at the meeting her efforts in reestablishing lost business like Dex and the "mandate to award current and future lodging bookings to [Castillo]" because it removed sales from her bottom line and increased Castillo's. Owen replied that he would arrange a meeting with Campbell as soon as he could.

On the morning of July 15—the date of the meeting with Campbell—Dehnel sent Larson a request for a confidential meeting because she was "not comfortable in further discussion with [her] immediate supervisor due to the history of aggressive behavior—one in particular being the catalyst for [her] to keep [her] physical distance from him as much as possible." Larson replied that she was happy to talk with Dehnel but would not be available until the end of the week.

A few hours later, just after 3 p.m., Owen emailed Dehnel about Campbell's arrival. Dehnel replied, "I requested a meeting with HR before sitting down due to the nature of what has and is transpiring. I would request a one on one with [Campbell]

might serve everyone involved a fair opportunity to discuss their side." Dehnel surreptitiously recorded the meeting with Owen and Campbell on her phone.[11]

During the meeting, Dehnel "regurgitated . . . everything that had transpired, [her] concerns and such," including her perception of Owen as aggressive. She gave specific examples—the A/C incident and the F-Dex incident—and identified Jackson and Haley as A/C incident witnesses and Harding as the F-Dex incident witness. Dehnel also claimed that Owen frequently threatened to fire people. Owen testified that he learned during the meeting that Dehnel had been upset about switching offices and said that he had offered to move her back, stating that he told her, "[I]t will be six people in here, or something like that, but if you want to move back, I'll move you back into the office."

That evening, Dehnel sent Campbell an email containing the emails surrounding her dispute with Castillo and reiterating her complaints about Owen, stating that she had tried to stand up for herself at the meeting and noting, "Truth be told, it is grossly embarrassing for me especially at my age as it all touches on a juvenile[-]type experience." On July 16, Campbell thanked Dehnel for her email and told her that she had passed the information along to HR; she copied Larson on the message.

Along with forwarding Dehnel's post-meeting email on July 16, Campbell summarized for Larson her impressions from the meeting, stating,

---

[11]Although the recording was transcribed, it was not admitted into evidence.

It was honestly very confusing what [Dehnel] was really upset about.[12] She claims that "everyone" thinks that [Owen] is aggressive. I asked her who everyone is, and she said to just ask the front desk. I again asked who as it wasn't constructive to just generalize. She finally said ok ask . . . [Jackson, Harding], and Haley. I haven't spoken to them yet but will if you think I should. She brought up that [Owen] jumped up and was aggressive with her the week she first started. Asked her why she didn't report it and she said it was because she didn't want to lose her job. She said [Castillo] wasn't being cooperative and wrote something in red in an email last week.

It is a lot of disconnected incidents. She didn't send me original emails but copied them in below. Even in the emails below that she copied, I really don't get what was upsetting. Sounds like there are process issues to work out on site, and sounds like [Owen] can get heated when he is frustrated, but I have never seen him be aggressive. She very much painted a victimized picture yesterday[,] but I didn't see evidence to support it. She brought up that she had experiences with aggressive men in her past and that [Owen's] reactions scared her.

I reinforced that if she has a question for anyone on site or feels like a system or process is failing, that she should put it in a case and assign it to [Owen]. She also seemed confused by what an open door policy is. I told her it meant she could call anyone in HR, me, [Pariza,] etc[.] anytime if she felt something was not being handled properly.

Owen also emailed Larson, stating,

Last week [Dehnel] got into a disagreement with [Castillo]. . . . In a conversation with [Dehnel], she began to state that I was also a part of the problem. She said the following:

- I fire people for no reason[.]

- That when she first started, that I came out from behind my desk and got in her face and started yelling.

---

[12]Campbell testified that as to Dehnel's complaints in the meeting, "It seemed to be a lot of just interpersonal, site-level bickering . . . ." She added that "part of the problem is the lack of use of [Boxer's] system. So the information really couldn't ever be tracked or even identified to substantiate what [Dehnel] was saying."

24

- I am physically aggressive toward women.

- She is currently seeing a counselor because of this job[.]

- Boxer has no open-door policy for addressing issues[.]

When she said these things, I told her she was welcome to contact HR and I would arrange a meeting with her and [Campbell]. [Campbell] came over yesterday and sat with us both. After an hour, [Dehnel] then sat with [Castillo] and [m]yself. [Castillo] and [Dehnel] apologized to each other. [Campbell] told her to contact HR if she feels she has an issue.

My thoughts. [Dehnel] is achieving a little under 50% of her sales goal.[13] I have dedicated almost all of my time since [Hayes] left to sales. [Dehnel] has been resistant to what I am trying to accomplish in the restructure of the department. About 3 weeks ago she had an encounter with [Castillo]. . . . I am hopeful our sit down yesterday resolves, but [Campbell] asked that I email you.

At Dehnel's July 16 noon counseling appointment, she reported that she had confronted Owen—her boss—in front of Campbell—his boss—and that she felt good about how she had handled it but feared retribution and job loss. Dehnel testified, "Apparently, [Larson] sent the [July 15] information over to [Owen]," and then he called her into his office on July 16 after lunch "and pretty much gave [her] a good chewing." Dehnel stated that Owen told her that if she had a problem, she needed to deal with him directly and that after that point, Owen "started really coming down on [her,] saying [her] numbers weren't where they needed to be." Owen testified that he did not recall

---

[13]Larson testified that she did not independently investigate Dehnel's sales goal and that she had assumed Owen's information was accurate.

25

when he found out that Dehnel had emailed Larson and did not recall calling Dehnel into his office the next day and having a conversation with her.

In an email to Larson confirming their upcoming meeting on July 19, Dehnel told Larson that she wanted "a verbal discussion to start the grievance process as [she] trust[ed] that [Larson's] investigation will generate a solution and remove the fear of retaliation[14] and being singled out currently and in the future." Dehnel added, "I want to follow all the necessary[ ]required steps and ensure my paperwork is organized for easy viewing, back-up, and witnesses in support of my grievance claim."

## I. Dehnel's first discrimination complaint

The record contains Dehnel's July 22 follow-up email to Larson after their July 19 meeting, along with Dehnel's accompanying selection of annotated emails. Dehnel blamed Owen's having separated the sales team for the Castillo miscommunication and thanked Larson "for taking the action needed to find and implement a resolution and respecting the confidentially [sic] to the possibility of backlash." She included her June 21 overwork email,[15] Owen's June 22 response about individual goals,[16] her June 22

---

[14]Dehnel testified at trial that the alleged retaliation was only as to Owen's actions and not as to Gill, Larson, Campbell, Hayes, or Castillo.

[15]In her annotation, Dehnel noted that after Shahan told Owen that he wanted a "secretary-admin" so that he could focus on selling and not data entry, Dehnel had been advised that Owen planned for her "to do all data input for all the sales team members, plus [her] own."

[16]In her annotation, Dehnel complained that Owen had not been counting her lodging bookings and told her that she was failing to "meet 'her numbers' (whatever

cradle-to-grave email, and Owen's June 23 response about catering sales as her primary responsibility. She also asserted that she had not been treated fairly in comparison to how Owen treated Castillo and Gaitan, allowing them a flexible schedule, and noting that Castillo "is now the DOS or acting DOS."[17]

Dehnel also bulleted the following complaints[18]:

- [Owen] moved me away from the Sales team into the administration room immediately after hearing of [Hayes's] departure.
  - [Owen] has made reference on several occasions that there is no longer any female drama since [Hayes] left and has [al]luded to the fact that I create drama just like [Hayes] did. This is unjustified, not true and unprofessional to continue making slang remarks about [Hayes] or me.
- I am no longer included or invited to attend any sales meetings.
- I have been removed from attending our daily NETMA meetings . . . . I was told I could attend on Wednesday afternoon only.
- I am forced to scramble to get information and to give information.
- [Owen] moved [Griffin] and [Gaitan] into the sale[s] office. [Owen] made the statement that it was easier to mold the younger women than it was the older ones. I assume this is one of the reasons he moved me.
- [Shahan] was not fired due to lack of productivity—he was fired after [Owen] called him into his office about some emails [Shahan] had sent

---

those may now be)." Dehnel further stated that Castillo had advised her "a few weeks ago" that what she had on the books was not being loaded. And she directed Larson to Owen's statement that he would "[t]ake into account the lodging revenue [Dehnel had] already booked."

[17]At trial, Dehnel testified that after the July 15 meeting, Castillo became her boss. The record reflects that Castillo was made DOS effective July 31. Owen testified that promoting Castillo was decided between him, Gill, and IHG's Brown, whose approval was required.

[18]We have removed Dehnel's emphases to improve readability.

27

[to Owen] over the weekend.[19] As is the norm, a shouting match ensued and [Owen] fired [Shahan] for that.

- o (1). *I am singled out because of my age, as it appears.* [Emphasis added.]
- o (2) I am a seasoned "older gal" who can have an opinion and knows the business. I was a DOS and Operations Manager for 12 years—I started in the industry with no experience in sales or hospitality . . . . but I had a knack and I have been highly successful. YtY revenue increase for a straight 12 years.
- o (3). I believe [Owen] also moved me so that I would not be in the loop of what IS being offered/executed with the other sales personnel, that is NOT offered or applied equally for myself or other staff.

It is my firm belief that [Owen] has been [and] is singling me out by placing me into a position that is destine[d] to fail at meeting a bottom[-]line rev[enue] requirement. He can then fire me and/or work at pushing me to a point where I have no choice but to quit. I have been dedicated, worked hard and certain[ly] do not deserve this treatment from him.

Dehnel also complained that her office phone had not worked since the office switch, causing her to "miss 99% of the business calls that come in," and she complained about her slow computer that "forces an extra 2 hours at minimum to [her] work day." She stated that Harding had received an additional computer screen in less than a week after asking Owen for one and that Pham told Dehnel that her computer's

---

[19]Shahan's June 30 email to Owen had the subject line "90 days." Among other statements in his rambling email, Shahan asked Owen not to degrade him or humiliate him "with the no bookings." He told Owen,

I am one of the best sales directors in our industry and I do not need you to make[ m]e think I can't sell. . . . I do not understand what is going on and there is a big chance that one day you will have to answer under oath about the last 3 months.

Owen forwarded the email to Larson on July 1.

hard drive needed to be updated. She concluded the seven-page email by identifying the A/C incident, witnessed by Haley and Jackson, and an incident involving a coworker (Lamar)[20] who had physically attacked Adame but had kept his job, and then she stated,

> As we discussed in our phone meeting, this is only a portion of what I have endured. The endless shouting, *age discrimination*, cursing, threats to fire me, fire others and physical aggression have/are common place. I took an opportunity to draw a line with [Owen] on Friday[,] July 12th. I called his bluff-threat tactic if you will, to call [Campbell] for sit down with [Owen], [Castillo,] and I. *When [Campbell] arrived I spoke candidly and honestly to her about much of what you and I have reviewed.*[21]—[Castillo] was not present in the meeting. [Emphases added.]

Larson testified that she had reached out to IT after Dehnel's emails to try to help with the computer and phone issues and that, to protect both employees, "We suggested that there always be a witness in the room whenever she met with [Owen], to have [Griffin] or [Campbell] or someone in the room, so that she would be more comfortable speaking to [Owen]."

Dehnel testified that between August and September, Owen was neither respectful nor professional with her and that she was frequently called into his office for discussions. She stated,

> He was usually angry with me about something. He . . . started having [Griffin] as a witness. They were -- it was very -- I was tired from it. I was exhausted. It was unnecessary, and it was just like berating me for things

---

[20]Lamar's last name was not identified in the record.

[21]Dehnel did not specify whether she had mentioned age or gender discrimination to Campbell during that conversation.

that just weren't necessary. And it was embarrassing, it was humiliating. There's a glass, people in there can see that I'm being called into his office on a regular basis. I didn't like that.

Jackson, whose employment Boxer terminated in October 2019, corroborated her testimony, stating that during Dehnel's last two months at the hotel, he frequently saw her in Owen's office.

On August 1, Owen and Gill exchanged emails about a new corporate sales manager's August 5 start date. Owen asked Gill to think about the following week for some online training, stating, "I think it is important we do this by the book.[] I want to emphasize accountability to all. I want [Dehnel] included."[22] Owen assigned a Boxer case to Dehnel that day with her August budget revenue responsibility. He testified that after the July 15 meeting, he put in an email proof that he was giving her specific numbers.[23]

On August 15, Owen asked Dehnel in a Boxer case to verify that her projected revenue from August 14 through December 31 was accurate at $21,077. He then sent Larson an email with a link to that Boxer case. Larson replied to Owen's email, "Okay, I looked at it (and I've looked at the others you have sent me as well). What is the

---

[22]Dehnel's August 1 counseling notes do not indicate any work problems. Instead, they state, "She is dealing with stress from [her father's] probate case and dealing with heart issues. Her doctor is aware of the situation and she is being seen by a cardiologist." On September 16, Castillo approved Dehnel's leave request for a September 19 cardiologist appointment.

[23]Dehnel testified that August was the first time she had received a target.

problem with this one?" Owen replied that Syed, Boxer's controller, was asking for sales pace and that Dehnel's sales goal "from now until the end of the year is approximately $81,000. She is showing $21,000 definite. It makes her pace roughly 25% of her goal. We discuss with [Syed] each month to forecast if the hotel will hit the budgeted numbers. I am verifying if her numbers are accurate."

In her response, Dehnel told Owen that her estimated bookings would be $40,067.37. Owen replied a few minutes later, stating, "Send me the report from the system where you are getting these numbers." Dehnel replied that she kept her own log. Owen then gave Dehnel specific instructions, stating,

> I need you to do the following today:
>
> 1. Click on "F[ACTS]", then "Hotel", then "Active Hotel Opportunity". Tell me if you see you[r] name as a sales manager? This is where the screenshot that I have attached to this case comes from. This is information that I have to review with [Pariza and Syed] today. You can see from the attached spreadsheet that you have activity in the system. You simply follow the same process for putting all information in the system. If some does not appear, you must place a Boxer Case with the issue to [Castillo]. Having accurate information in the system is how the sales team performance is measured.
>
> 2. Have you gone back in the system and changed the revenue numbers for past groups to actual pickup for the numbers you have placed in this case?
>
> 3. I need you to copy me on the case where [Hayes] instructed you to use a manual system for tracking business the wa[y] you are currently doing. I'll need to share this with Corporate when I turn these[] numbers in today.

Dehnel responded three days later, on August 19, after her approved vacation time.

31

## J. Dehnel's second discrimination complaint

Dehnel sent Larson an email on August 19 with a link to a Boxer case, an account of her job difficulties, paperwork from the August 15 Boxer case about her projected revenue, and some of the same emails she had already sent to her: the June 21 overwork email, the June 22 individual-goals email, and the same age- and gender-discrimination complaints she had raised in her July 22 email. Dehnel complained,

> I wanted to provide the link of correspondence and just a small portion of information for my file as it is still an uneasy environment and grossly embarrassing for me but I have continued to do my job at the best level I can. Please advise if I need to resend this in a Case. I am concerned about confidential[ity] and [back]lash.
>
> Below is a response to a case from [Owen]. I just want to make sure it is validated that I have and had always provided my revenue numbers . . . . I am also attaching a[n] email that [Owen] sent out to the staff regarding DAVACO but for some reason I was not included or it did not make it to my inbox or maybe it was inadvertently trashed but I have looked for it and not able to find it. I only knew of it because it was tacked up on the wall in the kitchen area.
>
> . . . I took the initiative in the beginning to help [Owen] understand the system as well as providing to him revenue numbers. I have continued to do my u[t]most in securing business and accurate data against the daily struggle of being placed away from the sales team interactions and sales meetings.[24] [Castillo and Gaitan] have been in Jamaica for the past week and [Castillo] is having surgery today. [Owen] does not communicate with me at all except in a few cases (like the one attached) . . . .
>
> In addition, [in] our correspondence on 8/2/2019 you ask[ed] that I provide an update if I was not able to get resolution. I wasn't, so I took the initiative to help myself as best I could as noted below.

---

[24]In August 2019, Dehnel reported to her counselor that she felt isolated at work and that she had begun looking for a new job.

The office phone was never repaired ([Owen] and [Castillo] both were in the know it was not working). I finally took the initiative to do what I could for myself and move my work[]station over to [Harding's] old desk. I requested and personally informed the front desk and [Gaitan] to update the extension at that desk so I could hopefully begin to receive business calls and opportunities once again. . . .

As you know, [Owen] removed my attendance from NETMA and I have not been included in any Sales Meetings as of today. Even so, I have continued to take a respect[ful] approach to all that [Castillo] and [Owen] have request[ed] of me. My data is detailed and always has been.

However, there is always a variance of guessing in what we/I am supposed to do or not do in not wasting [time] or disturbing [Owen]. Please see one of the emails below stating that 80% of questions can be asked during NETMA (which I am to attend 1 day a week on Wednesday afternoons only—not sure when the other daily meetings take place now or if they even do) the rest can go to him in a "simple email"—this is one reason I steer away from the cases so as to not upset the apple cart but again it is a guessing game to do it or not do it.

At her counseling appointment that day, Dehnel told her counselor that she continued to be harassed at work, had received no support from HR, and was still looking for another job. She also discussed with her counselor going to the Equal Employment Opportunity Commission (EEOC).[25]

---

[25]At her September 9 appointment, Dehnel told her counselor that she had made a plan to change jobs, had taken out a home loan, and planned to take three months off to train for a real estate license, to "deal with [a] legal case," and to care for her mother. Dehnel testified that she had taken out the loan so that she could quit because she had not found another job and wanted out of the hotel business. At her September 16 appointment, Dehnel told her counselor that the loan had gone through. She also told her counselor that she was "resigning in 9 days. She has a hard time going to work now and [Owen] is still yelling, but [she] has more confidence since [she] plans to leave." In December 2019, Dehnel filed her EEOC complaint. She filed her original petition in September 2020, and trial began in February 2022.

On September 4, Owen emailed Campbell, stating, "I am suggesting you might consider yourself accessing [Dehnel's] email. I am concerned she could be sending company documents to a personal email account over the past 90 days."[26] Campbell forwarded the email to Pariza, stating,

> I am going to let [Larson] know [what] I am doing fyi. *We have had issues with [Dehnel] recently and [Larson] was involved.*[27] I met with her myself and observed some concerns. She tends to keep emails and then cut and paste segments to suit her objectives. She made some claims that I don't believe were true. [Emphasis added.]

On September 11, Larson emailed Pham, "Please provide me with the email box of Teresa Dehnel immediately." Ten minutes later, Larson received full access to Dehnel's email.

**K. The MeetingBroker incident**

MeetingBroker was a third-party clearinghouse for bookings and requests for proposals (RFPs). In April 2019, Dehnel noted to Castillo that the standard operating procedure for a MeetingBroker lead was to "send to [Gill] before a quote/offer can be made. – (Too much time – will not produce)[.]" In June 2019, Dehnel tried to upload

---

[26]The record shows that Dehnel had been sending to her personal email address information that included her emails about the Castillo situation in July and the Dex attrition and MeetingBroker situations in September.

[27]In addition to the discrimination complaints, Larson was also involved in Dehnel's September 2019 dispute about overtime and personal leave. It is unclear from the record whether Campbell was aware of the timesheet dispute, so we have not gone into it.

information into MeetingBroker several times without success and complained to Castillo and Owen.

On July 23, Dehnel received an RFP from MeetingBroker. Castillo attempted to assign this task to Dehnel on August 1, and Dehnel replied the next morning, "This request is duplicate work. I proposed this and have been working with [the client] since July 25th. We are both receiving the same data in [M]eeting[B]roker. . . . It is not necessary for you to assign to me as I review [M]eeting[B]roker daily." However, Dehnel testified that in June or July 2019, Castillo had replaced her as MeetingBroker administrator.

On August 12, Dehnel sent a Boxer case to Castillo in which she complained that she was no longer able to access MeetingBroker. Castillo responded two minutes later, stating, "Let me check, I have not done anything yet because [Gill] is the only Admin[.]" Four hours later, Castillo asked Dehnel whether she was still experiencing MeetingBroker issues. The next morning, Dehnel replied to Castillo, stating, "No, I can pull up the events[,] just not anything new at all coming in."

On August 27, Castillo asked Dehnel for help with MeetingBroker. Dehnel replied, "I wonder if mine is even working[;] I haven't gotten anything since last week." Dehnel added a few minutes later, "I have no leads or access to your leads. . . . I wonder if something isn't wrong on their end. But if you are receiving and I am not then there is a[n] issue on my end as well." Eight minutes later, Castillo told Dehnel, "I already fixed it[.] I just received one and it was rooms only."

35

On August 29, Castillo received a new MeetingBroker RFP and forwarded it to Dehnel. The next day, Dehnel sent a Boxer case to Owen, complaining that she had not been receiving MeetingBroker leads, stating,

> Yesterday [Castillo] inquired if I had responded to a lead you had distributed. It would now be a few days old and I have not received any information on said lead.
>
> The Meeting[]Broker Leads are no longer visible to me and my understanding is the leads are now being routed directly to you to be redistributed out for handling.

Owen replied that all leads were being sent to sales@boxerresorts.com "of which all sales managers should be on distribution" and that he would check on it. Dehnel told him, "I am unable to respond to the RFP sent via email. The RFP is still not showing up in my Meeting[]Broker account . . . . [N]ot under any titles and nothing under reassigned." Castillo subsequently printed out the MeetingBroker RFP for Dehnel and told her that she would call MeetingBroker.

On September 6, a MeetingBroker account manager emailed Griffin, the hotel's assistant GM, to let her know that bids were due within fourteen days for a project with a final September 20 bid date. Griffin forwarded the email to the overall sales email address, sales@boxerresorts.com. Griffin told them that Gill had "asked that all RFP notices be emailed to the generic sales email."

On September 12, MeetingBroker asked Dehnel for a status update. Dehnel then emailed Theresa Par at IHG, forwarding to her an error message she had received from MeetingBroker and stating, "My apologies, but I no longer have direct access to respond

36

to business opportunities. A change . . . was made in the process and the request[s] go directly to the DOS or GM who then re-distributes to the sales staff or is worked by the DOS."

On September 23, Brown from IHG emailed Owen and Castillo to ask for a groups-and-meetings status update that day. Castillo forwarded Brown's email to Dehnel and asked her, "Have you received any of these leads through Meeting[]Broker?" Dehnel replied, "No, once my direct access was removed, I have no longer been able to access Meeting[]Broker or receive any notification for RFP's. You were going to call Meeting[]Broker a few weeks ago, I think was last we spoke about it." She bulleted, "No access to Meeting[]Broker" and "No notification any longer from Meeting[]Broker" and copied both Owen and Brown.

Castillo replied to Dehnel that Dehnel's access had not been removed and stated, "Please let me know what error or message you are getting that says your access has been denied, I will get it fixed today." Dehnel responded, "It is the same error as we looked at together the last time. 'Access denied' no access unless you send like you did the last time. Nothing coming at all for emails." The next day, Castillo called MeetingBroker for help, and Dehnel was able to access the system. Owen testified that Castillo confirmed with MeetingBroker that Dehnel's access had not been removed and that MeetingBroker told Castillo that Gill was the only system administrator. Gill, as the MeetingBroker system administrator, issued passwords and granted or removed access.

## L. Dehnel's termination and its aftermath

On September 24, at 6:15 a.m., Brown emailed Dehnel and Castillo, copied Owen, and asked, "Why would your Catering Manager not have access?"[28] At 9:57 a.m., Owen forwarded Brown's query to Larson and copied Campbell. To that email, Owen added the following,

> I am hopeful we can have the next meeting with [Dehnel]. The email below is where [Castillo] was asking [her] had she received a lead through Meeting[]Broker (software IHG uses for leads). Instead of just answering [Castillo's] question, [Dehnel] replied and copied . . . Brown of IHG. She makes the statement that she no longer has access to Meeting[]Broker. Her access was never restricted or removed.[29]
>
> Here are the issues I am having:
>
> 1. Her budgeted revenue since June has been 52k. She has produced 22K. 58% shortfall from budget for last 90 days.
>
> 2. I cannot communicate with her because she is argumentative. The times I have tried having [Griffin] or [Castillo] sit in the meeting, she gets up and walks out saying she cannot handle this.
>
> 3. She sends cases to . . . Pariza without affording her Supervisors of the opportunity to solve. She is now sending comments to IHG that are not true.

---

[28]Owen testified that pulling IHG into the internal discussion was significant because he, Pariza, and Gill had pressured IHG for more help. He noted that Dehnel's bringing IHG in "might appear to IHG like we weren't even doing basic functions." Campbell testified that "to have someone from our staff reach out to [IHG] direct about what is really a site-level, interpersonal system issue, was just very inappropriate across the line."

[29]Campbell testified that she would have taken Owen's word for Dehnel's access not having been restricted or removed because she could not have known whether Dehnel could pull up the leads from the system.

I believe her actions are to deflect responsibility from her lack of production.

A minute later, at 9:58 a.m., Campbell replied to Owen and Larson, stating, "Oh no. That was highly inappropriate. We need to let her go soon. This is becoming very dysfunctional."

Larson replied to Campbell's email at 10:20 a.m., stating, "Let's try to discuss today—I would be fine with releasing her[30] as I feel she is a very disruptive employee and wants to have everything go her way.[31] When it doesn't, she becomes angry or accusatory—not a good situation at all."

At 11:48 a.m., Larson wrote to Campbell, "I talked with [Owen] this morning [and] . . . [w]e decided to try to have a conference call tomorrow morning and decide what to do about [Dehnel]." Four minutes later, Campbell replied to Larson and Owen, "Sure[.]"

On September 25, Dehnel had her counseling appointment at 1 p.m. The counselor noted,

---

[30]Larson testified that when she received Owen's email, her understanding of what he wanted was to meet with her, Campbell, and Dehnel to talk about what was going on and that between her receipt of his email at 9:57 a.m. and her response at 10:20 a.m., she had received no indication from Owen that he wanted to terminate Dehnel's employment.

[31]Larson testified that the information she had about Dehnel's being disruptive were all the emails Dehnel had sent to her as well as information from Owen and Campbell.

She has got [the] loan money. She has [a] girls[′] trip and then [will] see friend Tracy. She is planning to get her motorcycle license. Will train to be realtor. She is giving her notice this week and plans to go without insurance for a[ ]while until she is employed or can afford to buy it. . . . She said she was doing well and was ready to terminate now.

At 3:24 p.m., Owen copied Campbell on his email to Larson in which he stated, "[Griffin] and I terminated [Dehnel]. Once we had done so, she set the attached letter on my desk." Dehnel's letter was dated September 25, and Owen forwarded it to Larson and Campbell with his email. In the letter,[32] Dehnel stated that she was submitting her resignation and expressed her disappointment with Boxer's post-Hayes management, referencing the "history of repeated bullying, aggression, vilifying staff, singling-out, [and] blaming staff for spiraling business failures" and their effects, which prevented "loyal, dedicated, revenue[-]producing employee(s) from doing their job[s]."

At 4:20 p.m., Dehnel sent Larson an email from her personal email address, entitled "Discharged from Position," to which she attached the resignation letter she had given Owen after her termination. In the email, Dehnel stated,

> I was discharged from my position today due to "performance" was the reason given. Of course I know better than that, it was because I stood up for myself and did the right thing. But non[e]-the-less I have known for quite some time that I was being singled out and the ultimate goal from GM was to fire me. But with that, I still implemented my best to do my job with the small amount of resources that I had been left to me in the room I was placed in.
>
> My discharge came mid-afternoon today on 9/25/2019 from . . . Owen and [Griffin]. I am happy to accept and move on from that

---

[32]We have removed Dehnel's italics and different font sizes for readability.

environment. I have attached the letter I had intended on providing to you and [Owen] at end of day today.

I provided my original to [Owen] after he terminated me.

At 8:35 p.m., Dehnel sent an email from her personal email account to Boxer's owners. In this message, she recounted as a "handful of endless episodes that continue to take place under the current management" the Lamar–Adame attack and Shahan's dispute with Bell Helicopter, which had required an apology from Boxer to the City of Bedford but had not resulted in Shahan's termination even though he "made no revenue contribution."[33] She then complained,[34]

> I was terminated from my position today. The reason given was performance! However, that is not at all the case. I provided revenue gains for the hotel from time of my inception . . . . Sir, I was terminated because I finally had enough and stood up for myself a few month[s] ago. It has been nothing less than a beat down from that point on.

In her email, Dehnel recounted the A/C incident, her complaint to HR about it, and the backlash from Owen, listing the following:

- Early on I was placed and left in the HR administrative office away from the sales team.
- I was no longer included in sales meetings.
- I was no longer permitted to participate in the NETMA meetings accept [sic] 1 day per week. If I did not have any updates, I was asked

---

[33]Dehnel testified that Shahan had made an accusation of some sort against Bell Helicopter and that his action had resulted in Boxer's no longer being allowed to go to Bell Helicopter but had not resulted in Shahan's firing. She stated that Shahan was not terminated for a month and a half later.

[34]We have removed Dehnel's italics and bullet points for readability.

to leave the table and go back to my office while the house team stayed to discuss current business items.

- 3rd party options for booking business were eventually denied for me to have access to— Mainly being Meeting[]Broker.
- I sat in an office alone with a non-working office phone, computer issues and a cellular phone that was useless. I used my personal phone to gain business options.
- The last month I was expected to note my time[;] if 5 minutes late my pay was to be docked. However, any overtime was not presented as a wash. I have spent time working from 4:00am . . . to 8:00pm . . . . I would go home and work remotely to ensure my work was always current. I always came to work on the weekends and visit with guest[s] who had bookings and ensure that the event was going well and a good experience. . . .

. . . . I am relieved that I was terminated today, not angry. I held strong for a long time, I only wish I could have had a long term business opportunity with a company I had sought out to work with for a long time. . . .

She attached the resignation letter she had given Owen, stating that she "had intended to present [it] at the end of day today 9/25/2019. The GM implemented [her] termination mid-afternoon instead."

On October 16, Larson sent an email to Beth Griffin, one of Boxer's HR generalists,[35] forwarding Owen's September 25 email about Dehnel's termination. Larson told Beth, "After they termed her, she quit." Larson sent Beth the email chain in which Dehnel had copied Brown about lack of MeetingBroker access, and Owen's September 24 email about problems with Dehnel. Larson told Beth, "In the email

---

[35]Because this individual has the same last name as another Boxer employee, we will refer to her by her first name.

below, she claims we cut off her access to some IHG site, which was patently false. Rather, she seemed to have no idea how to correctly use technology." Larson sent Beth another email, stating,

> I just sent you several emails; read through them and you will get an idea of what has been going on. She blamed everyone except herself for anything that went wrong; set herself up as being some kind of bullied victim in the entire situation. Also, it should be noted that prior to her leaving, she completely wiped her emails—there is nothing in any of the folders. I suspected something was going on so got access to email and found that she was copying her personal email on almost all of her business emails, including ones to IHG management. She lied about so many things that eventually it became difficult to determine what was and was not true. Finally, after she left, she sent a very nasty and vindictive email about [Owen] and others . . . .

On the same day, Owen also sent Beth a summary, stating,

> . . . Pariza decided to put me in charge of the sales department upon departure of Cara Hayes, effective 06.01.19.
>
> There had been a history of issues between Cara Hayes, Teresa Dehnel, and Bette Gill regarding standards, procedures, and the use of Boxer Central Sales that I began to analyze and solve.
>
> My first order of business was to meet with the sales team as a group and individually to get more detailed knowledge of the issues that were impacting sales. At this time, I told them any issue they were having to place in a Boxer Case and forward it to me. From the very beginning, I got resistance from [Dehnel], telling me that the Boxer Central Sales System did not work, but not being positive in creating cases to get the issues solved.[36]

---

[36]Dehnel denied this during her testimony.

[Dehnel] was keeping all her work in paper format in a binder.[37] I again instructed her to put her work in the system or make cases giving specifics of where she was having issues.

During a review of [Dehnel's] past catering numbers, she was achieving approx. 50% of her goal over the past year. I informed her that she was now required to achieve budget and that I would give her time to do so.[38] She became argumentative, and soon after, she sent an email to [Larson] accusing me of being physically aggressive towards her the second week she was working for us that she had never reported. I then informed Shelly Campbell, and [Campbell] met with myself and [Dehnel].

*While HR was conducting an investigation,* [*Campbell*] *asked me to use* [*Castillo*] *as a witness anytime I needed to meet with* [*Dehnel*]*, which I began doing.* A couple of times, I attempted to meet with [Dehnel] regarding shortfalls to her goals; she would get upset and say she was seeing a counselor and taking medication because of this job. She would walk out of the meetings.[39] [Emphasis added.]

It became impossible to manage her to the point that I wrote the September 24th email to [Larson], informing her that I was unable to do so.[40] In that email, I stated that she had achieved 22k in revenue on a budget of 52k over the previous 90 days, a 58% shortfall from her budget sales numbers.

---

[37]Dehnel testified that she had "one tiny binder." She agreed that Owen had told her to put her work into the system as an ongoing expectation. Boxer's handbook required entries into Central Sales, stating, "No sales efforts may be recorded in any other format or program."

[38]Dehnel agreed in her testimony that Owen had told her that she was required to achieve budget but claimed that he never told her what the budget was.

[39]Dehnel denied that she had ever walked out of a meeting.

[40]Dehnel testified that she did not feel that she had been unmanageable.

I began to get calls [from] Brian Hill and David Brown of IHG[,] questioning her access to tools to do her job. She told them she did not have access, which was simply untrue.[41]

The bottom line is [Dehnel] never achieved her yearly budgeted catering revenue the entire time she worked for us. She also never used our Boxer Central Sales System as designed.[42] She deleted every email from her Boxer email account.[43] She sowed dissension and gossip with untruths among staff and management.[44] I repeatedly with [Castillo] as a witness told her I would do anything I could to make her successful,[45] but it failed.

## M. Additional termination evidence

Campbell, who was 55 years old at the time of the trial, testified that neither age nor gender discrimination played any role in her decision to terminate Dehnel's employment and that the decision was not based on retaliation. To the contrary, she stated that if she had gotten any sense that Owen or anyone else had been discriminating against Dehnel, she would "absolutely have put a stop to it." She stated that if Owen had wanted to terminate Dehnel but Campbell had not wanted to, she—along with

---

[41]Dehnel denied that it was untrue when she told the IHG personnel that she did not have MeetingBroker access. Dehnel further testified that she had not thought she was violating a Boxer rule or policy by copying Brown and that she had been unaware of events that made it embarrassing for Boxer for Brown to receive that email.

[42]In contrast, Hayes testified that there was no ongoing problem with Dehnel's use of Central Sales.

[43]Dehnel denied that she had deleted every email from her Boxer email account.

[44]Dehnel denied Owen's statement about dissension and gossip.

[45]Dehnel testified that to her recollection, she did not recall Owen's ever telling her that he would do anything he could to make her successful.

45

Larson, the HR director—would have had the authority to make the decision because Owen was her subordinate. Campbell stated that Larson, as HR director, had the power to overrule her and Owen.

Larson testified that Campbell was Owen's boss and that Owen did not have the authority to overrule Campbell on a termination decision. Larson testified as follows about Campbell's September 24 email:

> Q. When you read this statement from Shelly Campbell, what was your understanding of what she wanted to do?
>
> A. She wanted to end the employment relationship.
>
> Q. Okay. And then what did you want to do in response to her statement?
>
> A. I suggested that we discuss it.
>
> Q. Why?
>
> A. Just to make sure that we were handling it correctly.
>
> Q. All right. Did y'all discuss it?
>
> A. Yes.

Larson did not specifically testify about what she and Campbell discussed.

Larson and Owen both testified that they believed Campbell had initiated the termination decision. However, during discovery, Dehnel's counsel propounded the following interrogatory: "Identify name [and contact information of] . . . each person involved in the decision to terminate Plaintiff's employment, and describe each person's role in the decision-making process." Boxer answered the interrogatory as follows:

46

"Mike Owen was the primary person involved in the decision to terminate Dehnel's employment with input and involvement by Shelly Campbell and Betty Jean Larson."

Boxer's employee-termination policy stated that involuntary termination could occur for, among other things, "failure to maintain immediate and sustained performance improvement previously addressed in a Corrective Action Notice," but the record contains no Corrective Action Notices. Boxer's policy also stated that failure to abide by Boxer's standards of conduct would make an employee subject "to discipline and/or immediate discharge" and listed examples, including "[d]isruptive or unprofessional behavior"; "[d]isclosing confidential Company information"; "[u]nauthorized use of . . . mail system or other employer-owned equipment"; "[i]nattention to [d]uties" by ignoring or failing to complete job duties; and insubordination, which included "[w]illful refusal to comply with the instruction/direction of a Supervisor," "[r]efusal to do an assigned job," "unprofessional response to a service request," or "[d]elay in carrying out an assignment." Boxer's policy required a supervisor to contact HR before any termination "to receive proper guidance" because "of legal issues that could arise."

Boxer's confidential-information policy stated that "[t]he misuse, unauthorized access to, or mishandling of confidential information [which included any information without prior authorization that might be contrary to the company's interests] . . . is strictly prohibited and will subject an employee to . . . discipline up to and including immediate discharge." Additionally, Boxer's offer letter to Dehnel stated that her

47

employment would be "at-will" and could be "terminated by [e]ither party at any time, for any reason, without further obligation."

Dehnel testified that the September termination meeting was brief. Griffin told her that Owen needed to speak with her. She went to Owen's office, and he told her, "We've made the decision to terminate your employment due to your performance." However, Owen agreed at trial that before her July discrimination complaint, he had told Dehnel that she should not worry about being terminated for being short on the catering budget.

Jackson testified that when he asked Owen why Dehnel was terminated, Owen told him that Dehnel had been "stealing files," and that when Jackson pressed further, "it was more to the fact that he was in charge and what he said goes and that's that, you know." Campbell testified that to her, there were two items of significance in Dehnel's termination: (1) Dehnel's failure to use internal systems and (2) including IHG on an internal email.

## III. Sufficiency

In its first issue, Boxer contends that Dehnel failed to establish legally sufficient evidence of causation to support her retaliation claim, and in its fourth issue, Boxer argues that there is legally insufficient evidence to support her noneconomic-damages award.

## A. Standard of review

We may sustain a legal-sufficiency challenge—that is, a no-evidence challenge—only when (1) the record bears no evidence of a vital fact, (2) the rules of law or of evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of a vital fact. *Gunn v. McCoy*, 554 S.W.3d 645, 658 (Tex. 2018). In determining whether legally sufficient evidence supports the challenged finding, we must consider evidence favorable to the finding if a reasonable factfinder could, and we must disregard contrary evidence unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We indulge "every reasonable inference deducible from the evidence" in support of the challenged finding. *Gunn*, 554 S.W.3d at 658 (quoting *Bustamante v. Ponte*, 529 S.W.3d 447, 456 (Tex. 2017)).

Anything more than a scintilla of evidence is legally sufficient to support a finding. *Marathon Corp. v. Pitzner*, 106 S.W.3d 724, 727–28 (Tex. 2003). More than a scintilla exists if the evidence rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Gunn*, 554 S.W.3d at 658. On the other hand, no more than a scintilla exists when the evidence offered to prove a vital fact is so weak that it creates no more than a mere surmise or suspicion of its existence. *McAllen Hosps., L.P. v. Lopez*, 576 S.W.3d 389, 397 (Tex. 2019); *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983).

The factfinder is the sole judge of the witnesses' credibility and the weight to be given to their testimony. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003).

## B. Retaliation and causation

An employer commits retaliation, an unlawful employment practice, if it retaliates or discriminates against a person who opposes a discriminatory practice. *See* Tex. Lab. Code Ann. § 21.055. A retaliation claim is related to, but distinct from, a discrimination claim in that it focuses on the employer's response to an employee's protected activity. *Alamo Heights ISD v. Clark*, 544 S.W.3d 755, 763–64 (Tex. 2018).[46] A remedy only exists when the evidence establishes that a materially adverse employment action[47] resulted from the employee's protected activities. *Id.* at 764. An employee claiming retaliation must prove that but for her protected conduct, her employer's

---

[46]Boxer refers us to *In re Parkland Health and Hospital System Litigation*, No. 05-17-00670-CV, 2018 WL 2473852, at *10 (Tex. App.—Dallas 2018, no pet.) (mem. op.), arguing that "[w]hen the final decision maker is in the same protected class as the employee, there is a presumption that retaliation was not a factor in the decision to discharge the employee." But that presumption applies in a *discrimination* case. *See id.* (holding that the trial court erred by denying Parkland's plea to the jurisdiction on the plaintiff's discrimination claim because he did not establish a prima facie case of termination based on discrimination); *see also Agoh v. Hyatt Corp.*, 992 F. Supp. 2d 722, 744 (S.D. Tex. 2014) ("When decision makers are in the same protected class as the plaintiff, there is a presumption that unlawful *discrimination* is not a factor in the discharge." (emphasis added)).

[47]Termination is a materially adverse employment action. *Alamo Heights*, 544 S.W.3d at 788–89.

prohibited conduct would not have occurred when it did. *Apache Corp. v. Davis*, 627 S.W.3d 324, 325 (Tex. 2021). An adverse employment action based solely on reasons unrelated to the protected conduct destroys the causal link. *Id.*; *see Scott & White Mem'l Hosp. v. Thompson*, 681 S.W.3d 758, 761–62 (Tex. 2023) (discussing but-for causation and explaining that for a violation to occur, the protected conduct need not be the employer's sole motivation for the adverse action but that it must be such that without the protected conduct, the adverse action would not have occurred when it did).

In evaluating but-for causation evidence in retaliation cases, we examine all the circumstances, including temporal proximity between the protected activity—here, the discrimination complaints that occurred between July 19 and July 22, 2019, and on August 19, 2019—and the adverse action—the September 25, 2019 firing—as well as knowledge of the protected activity, expression of a negative attitude toward the employee's protected activity, failure to adhere to relevant established company policies, discriminatory treatment in comparison to similarly situated employees, and evidence that the employer's stated reason for the adverse employment action is false. *See Apache Corp.*, 627 S.W.3d at 325–26 & n.3 (citing *Alamo Heights*, 544 S.W.3d at 790); *see also Off. of Att'y Gen. v. Rodriguez*, 605 S.W.3d 183, 192–93 (Tex. 2020).

Evidence of disparate treatment of other employees' conduct requires that the employees' circumstances be comparable in all material respects. *Apache Corp.*, 627 S.W.3d at 339. To prove disparate discipline, for example, the employee must usually show that the misconduct for which she was discharged was nearly identical to that

51

engaged in by other employees whom the company retained. *Id.* The reason for the "nearly identical" requirement is to prevent a factfinder from determining the relative seriousness of misconduct without evidence of the employer's view. *Id.*

Further, an employer is not forbidden from addressing performance issues involving employees who have engaged in protected activity, including following through on known preexisting issues and addressing existing issues that come to light only during subsequent investigation. *Alamo Heights*, 544 S.W.3d at 791–92. An employee's denials of performance issues are insufficient to create a fact issue as to causation. *Id.* at 792. Instead, the "issue is whether the employer's perception of the problem—accurate or not—was the real reason for termination." *Id.* And context is critical in a legal-sufficiency review because "the lack of supporting evidence may not appear until all the evidence is reviewed in context." *Id.* at 793 (quoting *City of Keller*, 168 S.W.3d at 811); *City of Haltom City v. Forrest*, No. 02-20-00084-CV, 2021 WL 733057, at *4 (Tex. App.—Fort Worth Feb. 25, 2021, no pet.) (mem. op.) (noting that the significance of any given act of retaliation will often depend upon the particular circumstances because "[c]ontext matters").

Determining but-for causation cannot be a matter of weighing—or worse, counting—factors that may be helpful in analyzing circumstantial evidence in some situations. *Apache Corp.*, 627 S.W.3d at 337. In *Apache*, in considering causation, the court asked whether there was any evidence to support a jury's finding that but for the plaintiff's one-sentence reference to discrimination in an email, her employer would not

have terminated her when it did. *Id.* The court noted undisputed evidence of the plaintiff's insubordination before she sent the email and that both the plaintiff's and her supervisor's testimonies agreed that she was terminated for working unapproved overtime—an undisputed basis for her termination—meaning that "there could be no evidence that she would not have been terminated but for her email." *Id.* at 337–38. Further, the company's human-resources manager had told the plaintiff's supervisor to fire her *before* the plaintiff ever sent her discrimination email. *Id.* at 328, 338 (observing that carrying out a previously planned employment decision is no evidence of causation even if the employment decision was contemplated but not yet definitively determined). The court stated that the plaintiff's undisputed conduct gave her employer a legitimate reason to terminate her for insubordination; her subsequent email only added to her insubordination. *Id.* at 339.

Likewise, in *Thompson*, a nurse complained that she had been terminated for making a report to Child Protective Services (CPS) under Family Code Section 261.110, which requires reporting child abuse or neglect. 681 S.W.3d at 759–61. However, she had already received two written reprimands in 2015 for violating the hospital's personal-conduct policy and had committed a third policy violation in May 2016 by contacting a child's school nurse and disclosing the child's protected health information before she made the CPS report. *Id.* at 759–60.

On summary judgment, the nurse's termination report stated that she was terminated for a policy violation (contacting the school nurse) but also noted that she

had made the CPS report. *Id.* at 763. The court acknowledged that the nurse did not have to prove that her CPS report was the "sole" reason for her termination, and the fact that she was terminated for an additional reason would not prevent her from establishing the necessary causation, but it reiterated that the causation standard's "second half require[d] her to prove that the additional reason [policy violation], standing alone, was insufficient to cause [the hospital] to fire her when it did." *Id.* The nurse failed to do so when her second written reprimand—seven months earlier—had warned her that a third violation would result in her termination. *Id.* at 764. That is, the evidence established that her contact with the school nurse motivated the hospital to terminate her employment when it did, and she acknowledged that hospital employees would not be motivated to retaliate against her for making the CPS report. *Id.* "Without evidence that she would not have been terminated when she was 'but for' the CPS report, she [could] not establish a violation of Section 261.110." *Id.*

To determine, in the first instance,[48] whether an adverse employment action was taken because of retaliation, we focus on the final decisionmaker: "The plaintiff must show that the final decisionmaker was aware of the plaintiff's protected activity." *Esker v. City of Denton*, No. 02-17-00003-CV, 2017 WL 4819401, at *5 (Tex. App.—Fort

---

[48]A retaliation claim based on circumstantial evidence is subject to an evidentiary burden-shifting analysis. *See Alamo Heights*, 544 S.W.3d at 764 & n.5 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817 (1973)). But when there has been a trial on the merits, a court can bypass the burden-shifting analysis and proceed to the ultimate question of whether the plaintiff presented enough evidence for a jury to find that retaliation occurred. *EEOC v. EmCare, Inc.*, 857 F.3d 678, 683 (5th Cir. 2017).

Worth Oct. 26, 2017, no pet.) (mem. op.); *see Rodriguez*, 605 S.W.3d at 193 (explaining that in determining causation, the court focuses on those with authority in the decision-making process that resulted in the adverse employment action and whether there is evidence that the decisionmaker acted with a retaliatory motive). This is because if the employer is unaware of the employee's protected activity at the time of the adverse employment action, the employer could not have retaliated against the employee based on that conduct. *Esker*, 2017 WL 4819401, at *5 (stating that there was no evidence that the final decisionmaker was aware of the plaintiff's complaints to HR at the time the adverse employment decision was made, as conceded by the plaintiff in her deposition testimony and unsworn declaration). Evidence of one decisionmaker's improper motive cannot be imputed to all decisionmakers—or to the final employment decision— without evidence that the improper motive influenced the final decision. *Rodriguez*, 605 S.W.3d at 193.

Further, an employee's complaining only of "harassment," "hostile environment," or "bullying" is not enough. *Alamo Heights*, 544 S.W.3d at 786–87. There must be some actual indication of an improper motivation to put the decisionmaker on notice. *Id.* at 787 (stating that the principal could not have been reasonably alerted that the coach was acting out of sex-based discrimination from plaintiff's letter to the principal characterizing the coach's behavior as "inappropriate," "offensive," "bullying," "harassment," "embarrassing," "rude," and "intimidating"). Likewise, calling a plaintiff a "troublemaker," a "cry baby," or a "spoiled child" is not the sort of

behavior that constitutes a materially adverse employment action when it is unclear whether the statements refer to a discrimination complaint or some other workplace issue. *Brown v. Advoc. S. Suburban Hosp.*, 700 F.3d 1101, 1107–08 (7th Cir. 2012) (listing as not materially adverse mild epithets, staring and yelling, the "silent treatment," and incivility at meetings such as eye-rolling and commenting behind the plaintiff's back).

However, if the final decisionmaker merely "rubber stamps" another's recommendation to terminate employment, the causal link between the allegedly retaliatory intent and the subsequent termination may remain intact. *See Long v. Eastfield Coll.*, 88 F.3d 300, 307 (5th Cir. 1996) (describing "cat's paw" linking supervisor's allegedly retaliatory intent); *see also Zamora v. City of Houston*, 798 F.3d 326, 331–32 (5th Cir. 2015) (explaining that under a cat's paw theory, the plaintiff must establish that the person with a retaliatory motive somehow influenced the decisionmaker to take the retaliatory action). Evidence of generalized discussions between a decisionmaker and someone with knowledge of the plaintiff's protected activity creates only a speculative inference regarding the decisionmaker's awareness. *EmCare, Inc.*, 857 F.3d at 683.

### 1. The parties' arguments

Boxer argues that Dehnel failed to establish causation because she failed to establish that Campbell knew about Dehnel's discrimination claims or that Campbell's decision to terminate was based on any retaliatory intent. Boxer claims that, at most, "Campbell was aware that Dehnel had merely complained that Owen was a poor manager," that such an allegation is legally insufficient to support her retaliation claim,

and that Dehnel's testimony that she did not blame Campbell for retaliation made the evidence legally insufficient to support the jury's finding.

Dehnel responds that Boxer's argument is "based on two fictions: (1) that Campbell was the sole decision maker; and (2) that Campbell knew nothing about Dehnel's complaints of discrimination," and she argues that "there is no real need to focus solely on Campbell's knowledge and intent" or on Dehnel's own testimony about who discriminated and retaliated (i.e., only Owen) because it does not make all the other evidence vanish.

Dehnel refers us to jury question 3 and points out that the jury was not asked to decide if a *lone* decisionmaker knew about the discrimination complaints but rather whether *Boxer* would have terminated her but for her opposition to *Boxer*'s discriminatory practices. Dehnel contends that based on jury question 3's wording, the knowledge and motive of *any* Boxer employee was relevant and may have been weighed by the jury. Jury question 3 asked,

> Did *Boxer Property Management Company* discharge Teresa R. Dehnel because of Teresa R. Dehnel's opposition to a discriminatory practice?
>
> Teresa R. Dehnel must establish that without her opposition to a discriminatory practice, if any, her discharge would not have occurred when it did. There may be more than one cause for an employment decision. Teresa R. Dehnel need not establish that her opposition to a discriminatory practice, if any, was the *sole* cause of her discharge, if any.
>
> If you do not believe the reason *Boxer Property Management Company* has given for discharge, you may, but are not required to, infer that *Boxer Property Management Company* would not have discharged Teresa R. Dehnel *but for* her opposition to a discriminatory practice. [Emphases added.]

57

Answer "Yes" or "No."

Answer: Yes.

Because Boxer did not object to this instruction, we must measure the evidentiary sufficiency in light of it. *See Green v. Dall. Cnty. Schs.*, 537 S.W.3d 501, 506 (Tex. 2017).

Dehnel also refers us to *EmCare, Inc.*, 857 F.3d at 683–85,[49] and to the following evidence the jury heard about who decided to terminate her employment:

- Boxer's interrogatory stating that Owen was the primary person involved in the decision, with input and involvement by Campbell and Larson.

- Larson's testimony that Campbell made the decision and that she and Owen were involved in Campbell's decision.

- Campbell's testimony about when Boxer made the decision, i.e., after Campbell, Owen, and Larson had talked about it.

Dehnel further argues that there is evidence supporting an inference that Campbell knew about her discrimination complaints, especially because Campbell never denied

---

[49]In *EmCare*, the EEOC sued EmCare after EmCare terminated three employees, including Luke Trahan. 857 F.3d at 680. A jury found that EmCare had terminated Trahan in retaliation for complaining about workplace sexual harassment. *Id.* On appeal, EmCare contended that the EEOC had failed to present sufficient evidence of a causal link between Trahan's protected activity and termination because there was no evidence that the individual who decided to terminate him was aware that he had engaged in the protected activity. *Id.* at 683. But the evidence of the decisionmaker's awareness of Trahan's protected activity was based on "an abundance of conflicting testimony," allowing the jury to find that the decisionmaker was aware of Trahan's complaints, that the justification for firing Trahan was pretextual, and that more than one decisionmaker was involved in the termination. *Id.* at 684–85.

knowing about them, and that the causation element is satisfied under the "cat's paw" analysis.

### 2. Analysis

We begin with the decisionmaker, *see Esker*, 2017 WL 4819401, at *5, about which there was disputed testimony, allowing the jury to determine who—for Boxer—ultimately made the decision: Campbell, Larson, Owen, or some combination thereof, influenced by Owen's various reports about Dehnel that neither Campbell nor Larson independently verified. *Cf. Tex. Health & Human Servs. Comm'n v. Jackson*, No. 02-22-00203-CV, 2023 WL 2325189, at *4 (Tex. App.—Fort Worth Mar. 2, 2023, pet. denied) (mem. op.) ("It was undisputed that Salter made the final decision to terminate Jackson."). The record reflects that Dehnel made her discrimination complaints to Larson, who testified that to protect both Owen and Dehnel, "*We* suggested that there always be a witness in the room whenever she met with [Owen], to have [Griffin] or [Campbell] or someone in the room . . . ." [Emphasis added.] In his October 16 summary to HR, Owen stated, "*While HR was conducting an investigation, [Campbell] asked me to use . . . Castillo as a witness* anytime I needed to meet with [Dehnel], which I began doing." [Emphasis added.] Owen's October 16 statement illustrates Campbell's awareness of both the HR investigation and its basis before the termination decision. *Cf. EmCare, Inc.*, 857 F.3d at 683 (stating evidence of generalized discussions creates only a speculative inference of the decisionmaker's awareness). And although Campbell testified that she would have put a stop to any discrimination against Dehnel by Owen

59

if she had gotten any sense of it, the jury could have chosen to disbelieve her. *See Golden Eagle Archery*, 116 S.W.3d at 761. This factor weighs in favor of the jury's causation finding.

As to temporal proximity, Boxer fired Dehnel on September 25, almost immediately after she sent her September 23 message to IHG, just over two months after she made her first discrimination complaint about Owen to Larson between July 19 and July 22, and just over a month after she renewed her discrimination complaint about Owen to Larson on August 19. *See Alamo Heights*, 544 S.W.3d at 790 (noting that temporal proximity is relevant to causation when it is "very close" and that an eight-month gap between an EEOC charge and the termination recommendation was "so long as to be of little, if any, probative value"); *see also Allen v. U.S. Postal Serv.*, 63 F.4th 292, 305 (5th Cir. 2023) (stating that six-month gap between protected activity and termination was too long but that seven-week gap was not); *Besser v. Tex. Gen. Land Off.*, 834 F. App'x 876, 885 (5th Cir. 2020) ("We conclude that two and one-half months between the protected activity and the adverse employment decision, standing alone, is not within the 'very close' proximity that is necessary to establish causation."); *Esparza v. Univ. of Tex. at El Paso*, 677 S.W.3d 115, 126 (Tex. App.—El Paso 2023, no pet.) (stating that temporal proximity between a protected act and an adverse employment action may suffice as evidence of a causal connection when the acts are separated by weeks, as opposed to months or years). This factor weighs in favor of the jury's causation finding.

While the record may reflect various negative attitudes toward Dehnel generally by Larson, Campbell, Owen, and others (e.g., Gill), it is less clear whether their specific attitudes involved her protected activity (the discrimination complaints) or were related to her general performance or attitude. However, the jury could have reasonably determined that Larson's statement that Dehnel "becomes angry or accusatory" referred to Dehnel's discrimination complaints and to Larson's negative attitude about them. *See Golden Eagle Archery*, 116 S.W.3d at 761. This factor weighs in favor of the jury's causation finding.

Regarding the failure to adhere to relevant established company policies, Boxer had fired a salesperson (Shahan) a month or so before Dehnel's termination without following its verbal/written disciplinary procedure and Hayes, a supervisor, had fired Dehnel's predecessor Levy. Dehnel's offer letter from Boxer and the Boxer handbook showed that the progressive-disciplinary procedure—while favored—did not have to be followed in all circumstances. *See Jackson*, 2023 WL 2325189, at *6 ("The dispositive issue on [the employer's-failure-to-adhere-to-established-company-policies] factor is not whether an employer engaged in any activity against their own policies; rather, []we must ask whether an employer terminated an employee *against* its own policies.[]" (citation omitted)). However, although Boxer had various reasons under its employee-termination policy that the record would have supported for Dehnel's termination, including sending company emails to her personal email and releasing confidential company information to IHG, Owen cited her performance as the primary reason for

termination despite having told Dehnel before her discrimination complaints that he would take her lodging revenue into account and without having issued any corrective action notices. *Cf. Thompson*, 681 S.W.3d at 759–60 (noting that nurse had received two written reprimands before her third policy violation and that her second written reprimand had warned her that a third would result in termination); *Alamo Heights*, 544 S.W.3d at 792 (referencing the employer's perception of the problem as the "real" reason for termination).

We also note that, unlike in *Apache*, the parties' evidence did not agree as to why Dehnel was terminated and that her termination occurred after she made her discrimination complaints. *Cf.* 627 S.W.3d at 328, 337–38. Jackson testified that when he asked Owen why Dehnel was terminated, Owen told him that Dehnel had been "stealing files." After Jackson pressed Owen, however, Jackson concluded that "it was more to the fact that he was in charge and what he said goes." Owen told Dehnel she was terminated for performance, while Campbell testified that Dehnel's termination was based on her failure to use internal systems and for including IHG on the internal email.

Additionally, the record shows that although many Boxer employees experienced computer problems, Dehnel's were not remedied as quickly as others, and her phone problems were never remedied. The jury could have inferred that Boxer set Dehnel up to fail after her discrimination complaints by continuing to fail to resolve problems she had experienced since at least August 2018 and then using performance as an excuse to

retaliate by firing her, particularly considering her exceeds-expectations performance review before Owen became her supervisor. *See Jackson*, 2023 WL 2325189, at *6 (noting that "evidence that an employer is 'pleased with an employee's work performance supports a finding of pretext when that evidence contradicts the reason given by the employer of poor performance'" (quoting *Bell Helicopter Textron, Inc. v. Burnett*, 552 S.W.3d 901, 916–17 (Tex. App.—Fort Worth 2018, pet. denied)); *see also Allen*, 63 F.4th at 306 (recounting plaintiff's evidence that her supervisors had set her up for failure by obstructing her efforts to succeed at her job, including denying her necessary tools, and that her employer did not document the performance deficiencies that it relied on as a basis for her termination). This factor weighs in favor of causation.

As to discriminatory treatment in comparison to similarly situated employees, although Dehnel argued disparate treatment based on sex and age, the nonunanimous jury did not find either. The record reflects that Castillo was hired at a higher salary than Dehnel but also possessed more qualifications apart from Dehnel's overall sales experience: Castillo had the IHG certificate required to become DOS and she spoke Spanish, both of which were valuable to Boxer. The other sales employee, Shahan— who Boxer terminated before Dehnel, also without following the progressive-discipline policy—had more in common with Dehnel, but it is unclear from the record if he made a discrimination complaint before his termination. *Cf. Jackson*, 2023 WL 2325189, at *6 (noting that employees are similarly situated only if their circumstances are comparable in all material respects, including similar standards, supervisors, and conduct, and if they

also were terminated or suffered an adverse employment action after making their complaint). This factor appears to be neutral.

Based on all of the above, and in light of the jury charge and our standard of review, *see Gunn*, 554 S.W.3d at 658; *Marathon Corp.*, 106 S.W.3d at 727–28, we conclude that there is legally sufficient evidence to support the jury's causation finding. We overrule Boxer's first issue.

## C. Noneconomic damages

In its fourth issue, Boxer complains that there is legally insufficient evidence of the nature, duration, and severity of Dehnel's mental anguish or of any other noneconomic damages to support the jury's $32,000 award. Boxer argues, "Given that she was going to quit voluntarily . . . a few minutes later, no reasonable juror could find mental anguish associated with this termination of employment." Dehnel responds that the evidence is legally sufficient to support compensatory damages, including her mental-anguish damages, and that Boxer waived any complaint about the remaining compensatory damages by failing to address them.

Mental-anguish damages are neither punitive nor exemplary but rather are compensatory.[50] *Gregory v. Chohan*, 670 S.W.3d 546, 551 (Tex. 2023). As the supreme court has recently noted, "Assigning a dollar value to non-financial, emotional injuries

---

[50]The jury awarded $32,000 to Dehnel for "[c]ompensatory damages in the past, which include emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, and other noneconomic losses." *See* Tex. Lab. Code Ann. § 21.2585.

such as mental anguish . . . will never be a matter of mathematical precision." *Id.* at 550. The damages awarded for a noneconomic injury must be "the result of a rational effort, grounded in the evidence, to *compensate* the plaintiff for the injury." *Id.* Thus, there must be evidence both of the "existence of compensable mental anguish" and "evidence to justify the amount awarded." *Id.* at 551. As to both existence and amount,[51] there must be evidence of the mental anguish's nature, duration, and severity. *Id.* at 554, 557.

The mental anguish must have been such that it caused a substantial disruption in the plaintiff's daily routine or a high degree of mental pain and distress. *Id.* at 555 (quoting *Bentley*, 94 S.W.3d at 606). In some cases, for example, there may be direct evidence supporting quantification of an amount of damages, such as evidence of the likely financial consequences of severe emotional disruption in the plaintiff's life, or evidence that some amount of money would enable the plaintiff to better deal with grief or to restore her emotional health. *Id.* at 560.

"The presence or absence of pain, either physical or mental, is an inherently subjective question." *Stone v. Christiansen*, No. 02-22-00450-CV, 2023 WL 5766076, at

---

[51]As to justifying the amount, in *Bentley v. Bunton*, for example, the supreme court struck a $7 million award because although the record left no doubt that the plaintiff had suffered mental anguish as a result of the defendants' defamatory statements, his testimony that the ordeal had "cost him time, deprived him of sleep, caused him embarrassment in the community in which he had spent almost all of his life, [and] disrupted his family," and his friends' testimony about his depression and the impugning of his honor and integrity, was "no evidence that [he] suffered mental anguish damages in the amount of $7 million, more than forty times the amount awarded him for damage to his reputation." 94 S.W.3d 561, 606–07 (Tex. 2002).

*6 (Tex. App.—Fort Worth Sept. 7, 2023, no pet.) (mem. op.) (quoting *Gen. Motors Corp. v. Burry*, 203 S.W.3d 514, 551 (Tex. App.—Fort Worth 2006, pet. denied) (op. on reh'g)). A jury has wide latitude in determining the appropriate amount of damages for such injuries, and the plaintiff's credibility is central to such claims. *Id.* at *6–7. Mental anguish includes the mental sensation of pain resulting from such emotions as grief, severe disappointment, indignation, wounded pride, shame, despair, and public humiliation, and recovery is warranted when the plaintiff's mental pain has risen to such a level that it has rendered her incapable of dealing with certain everyday activities like eating, sleeping, working, and socially interacting. *Katy Springs & Mfg., Inc. v. Favalora*, 476 S.W.3d 579, 595 (Tex. App.—Houston [14th Dist.] 2015, pet. denied). There are no magic words to establish mental anguish. *Id.*

A plaintiff's testimony alone can suffice to prove mental anguish, although corroborating evidence from a spouse or friend can be helpful in determining evidentiary sufficiency. *Bearden v. LeClair*, No. 02-20-00177-CV, 2022 WL 3273598, at *18 (Tex. App.—Fort Worth Aug. 11, 2022, no pet.) (mem. op.). When a claimant fails to present direct evidence of the nature, duration, or severity of her anguish, we apply traditional "no evidence" standards to determine whether the record reveals any evidence of "a high degree of mental pain and distress" that is "more than mere worry, anxiety, vexation, embarrassment, or anger" to support any award of damages. *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444–45 (Tex. 1995) (noting that qualifying events supporting an inference that injury was accompanied by mental anguish have shown "a

threat to one's physical safety or reputation or involved the death of, or serious injury to, a family member");[52] *see Bearden*, 2022 WL 3273598, at *18 ("The record must provide either direct evidence of the nature, duration, and severity of a plaintiff's mental anguish, thus establishing a substantial disruption in his daily routine, or evidence of a high degree of mental pain and distress that exceeds mere worry, anxiety, vexation, embarrassment, or anger.").[53] Generalized, conclusory descriptions of how an event affected a person are insufficient evidence upon which to base mental-anguish damages.

---

[52]In *Parkway*, the plaintiffs bought a home in 1981 that was flooded by a nearby developer's activities in 1983, 1986, 1987, and 1989. 901 S.W.2d at 436–37. The court of appeals deleted their mental anguish damages award. *Id.* at 438. After performing a historical overview of that area of law, *id.* at 442–44, the supreme court agreed with the deletion because although the evidence showed that the plaintiffs "felt anger, frustration, or vexation," it did not support the conclusion that those emotions rose to a compensable level. *Id.* at 445.

[53]In *Bearden*, the plaintiff sued for malicious prosecution and defamation after the dismissal of a felony-theft indictment that his former clients had collaborated to procure against him. 2022 WL 3273598, at *1. The plaintiff testified that in the weeks after his indictment and arrest, he experienced dry heaving, diarrhea, frightening involuntary muscle twitches, sleeplessness, and anxiety so intense that he sought medical help. *Id.* at *18. He saw a counselor for over a year, described himself as an emotional "wreck," and contemplated suicide. *Id.* He characterized the situation as causing him a high degree of mental pain and stress that he had never before experienced. *Id.* His pastor testified that he made daily welfare calls after the plaintiff brought up suicide. *Id.* at *19. We concluded that there was sufficient evidence of compensable mental anguish before turning to the amount of damages, noting that the jury's $500,000 past-mental-anguish-damages award for malicious prosecution had been reduced in the judgment to $485,000, which the defendant challenged as excessive. *Id.* We concluded that in light of the evidence, the award was not excessive, noting that the plaintiff had "faced losing his liberty for up to two years—730 days, 17,520 hours, more than one million minutes—for a crime that both [the defendant] and he knew he did not commit." *Id.* at *20–21.

*Miller v. Watkins*, No. 02-20-00165-CV, 2021 WL 924843, at \*19 (Tex. App.—Fort Worth Mar. 11, 2021, no pet.) (mem. op.) (quoting *Anderson v. Durant*, 550 S.W.3d 605, 619 (Tex. 2018)).

Descriptions sufficient to sustain a mental-anguish finding have included testimony about treatment for anxiety and depression, losing time with family and friends and other substantial impacts on family relationships, and changes in demeanor and sleep. *Id.* at \*20 (referencing *Bentley*, 94 S.W.3d at 606–07, 619–20); *see also Bennett v. Grant*, 525 S.W.3d 642, 648–49 (Tex. 2017) (holding evidence sufficient to support high degree of mental pain and distress when plaintiff's daily routine was substantially disrupted to the extent that he was afraid to leave his house, his demeanor changed significantly, and he experienced headaches, a weak stomach, a loss of appetite, and sleep deprivation).

For example, in *Anderson*, a defamation case, the plaintiff testified about the impact on his family relationships, that he had developed paranoia and anxiety during the "two-year nightmare trying to get [his] life back and [his] reputation back," and that he had experienced trouble sleeping, eating, and focusing, along with worry about his family's future and his "30-year career that had been slandered all over town." 550 S.W.3d at 620 ("Anderson's testimony is some evidence he suffered compensable mental anguish."); *Rogers v. City of Fort Worth*, 89 S.W.3d 265, 283–84 (Tex. App.—Fort Worth 2002, no pet.) ("[T]he [legally and factually sufficient mental-anguish] evidence shows that Rogers was 'devastated' over being fired, became extremely depressed, and

68

lost all motivation. In addition, his sleep pattern was completely disrupted . . . [and he] also became extremely irritable, so that his wife could not even have a conversation with him."); *see also Tex. Dep't of Transp. v. Flores*, 576 S.W.3d 782, 801 (Tex. App.—El Paso 2019, pet. denied) (holding evidence was sufficient to support mental-anguish award when plaintiff testified that his termination was "devastating" to him, that he had lost his "pride," "dignity," and self-image, that he had been dedicated to his job for over twenty years and proud of his performance ratings and reviews, and that the loss of his job had "broken" him).

Boxer refers us to *Saenz v. Fidelity & Guaranty Insurance Underwriters*, 925 S.W.2d 607 (Tex. 1996), to support its argument that there is legally insufficient evidence to support Dehnel's award. The plaintiff in that case sued her employer's worker's compensation carrier and adjuster for wrongfully inducing her to settle her claim. *Id.* at 608. The supreme court held that there was no evidence that the plaintiff had suffered mental anguish when the only evidence in the record was the following question and the plaintiff's answer:

> Q[.] Can you tell the jury what it is that you were concerned about . . . this lifetime medical benefits and who was going to wind up paying for the lifetime medical benefits that you were told you were going to incur?
>
> A[.] I worried about that a lot. My husband was already working two jobs, and I was worried also that we were going to lose our house because when we bought it we had two incomes, and I knew that we couldn't afford the medical bills that we were going to have.

*Id.* at 614. The court held that the plaintiff's concern about future medical expenses did not rise to the level of compensable mental anguish. *Id.* (stating that proving worry, anxiety, vexation, and anger is insufficient without proving that the distress "involved more than these emotions").

Dehnel gave the following testimony about mental anguish during her attorney's direct examination.

> Q. . . . Did you experience any mental anguish as a result of the conduct you were alleging was unlawful?
>
> A. Yes, I did.
>
> Q. Describe it for me.
>
> A. Depression, embarrassment, humiliation, anxiety.
>
> Q. That's not going to cut it. You've got to tell me, give me -- you know, explain an event or something that you can describe, you know, with a little -- an example or detail.
>
> A. As -- can you rephrase the question? I'm not really sure I understand.
>
> Q. I'm asking you if you had mental anguish, to describe it, but not just to use a word or two --
>
> A. Uh-huh.
>
> Q. -- to narrate, you know, a couple of examples for me.
>
> A. Depression, sleeping all of the time, not going out and spending time just doing the normal things that you do in life. I just didn't want to leave the house. . . .
>
> . . . .

70

Q. . . . [T]o be terminated and feel -- I mean, obviously you feel it was not a right decision.

A. Correct.

Q. How did that feel?

A. Gosh, just almost like a betrayal, very unfair. I didn't understand. I didn't understand why it was like that, why it happened the way that it -- it just -- why they had to go that direction, or [Owen] did.

Q. And did you get any closure back from HR or Campbell responding to you when you tried to go to them for concerns and help?

A. No, I did not.

Q. How did that feel?

A. Abandonment kind of, like I was shunned, if you will, that this is the leper, if that makes since.

Q. Okay.

A. Stay away from her.

Q. Is there anything else you want to say on that topic?

A. It was -- it was difficult all the way around. It just created a lot of -- more depression and my ability to just want to be able to get out and do things, I did not want to do anything. I was very upset. It was difficult, it was humiliating.

Dehnel also testified that after Boxer fired her—on September 25, 2019, not quite half a year before COVID-19 arrived in Texas —she lacked health insurance and that this was a concern for her during her months of unemployment. She was unable to pay some of her out-of-pocket medical expenses after she sustained an injury and so was unable to have all the recommended treatments and therapies; she also had a

preexisting condition called Sjogren's Syndrome,[54] and before the termination, Dehnel was seeing a cardiologist. After the COVID-19 pandemic arrived in Texas, she worried about getting sick without health insurance. Despite looking for a new job before and after Boxer fired her, Dehnel was out of work from the end of September 2019 until sometime between May and August 2021. Dehnel's mother, who was ill and relied on Dehnel for care, lived with Dehnel before and after Boxer terminated her.

During cross-examination, Dehnel acknowledged that she had experienced some stress before her termination from her father's death and the ensuing probate litigation and that she had started seeing a therapist in early June 2019 to work out her depression and grief. Boxer's counsel asked her, "How was the stress from your father's death and the probate litigation any different or separate from the stress you're alleging in this lawsuit? Can you distinguish the two at all?" Dehnel replied, "They are different types of stress. Each one is different, so I can't say, um, if one created more than the other or not."

Dehnel described that when she still worked at Boxer, she was "always worried about what was going to happen," and it was "[u]sually tears before [she] got there and tears when [she] left, but [she] still kept going." In addition to the hotel's loss of its major client, Boxer had also put the hotel up for sale, adding to employees' uncertainty.

---

[54]Although not defined at trial, Sjogren's Syndrome is an inflammatory disorder with symptoms of dry eyes and dry mouth. *Minn. Mining & Mfg. Co. v. Atterbury*, 978 S.W.2d 183, 192 (Tex. App.—Texarkana 1998, pet. denied).

In early September 2019, Dehnel took out a loan against her home so that she would be able to continue to care for her mother while looking for another job.

"[W]hether to award damages and how much is uniquely within the factfinder's discretion." *Golden Eagle Archery*, 116 S.W.3d at 772. It is clear from the record that Dehnel had an abundance of stressors in her life before her termination—her father's death, the ensuing probate litigation, her mother's illness and her role as caregiver, health issues, and her work environment after Hayes left Boxer—and that her stress changed after her termination to reflect the additional concerns of the unemployed as well as her depression, embarrassment, and humiliation stemming from being fired. Specifically, Dehnel testified that after Boxer fired her, she was depressed, experienced changes to her sleep, and stopped doing her normal daily activities.

The jury had the benefit of observing Dehnel as she testified about her experience and mental anguish and from that observation could assess her emotional demeanor, gain some insight into the severity of her suffering, and determine her credibility on the question of compensatory damages. *See Stone*, 2023 WL 5766076, at *6 (noting that the presence or absence of mental pain is inherently subjective and up to the jury); *Katy Springs*, 476 S.W.3d at 595 (stating that mental-anguish recovery is warranted when the plaintiff's mental pain has risen to such a level that it has rendered her incapable of dealing with certain everyday activities). And, as Dehnel points out, the jury awarded $32,000 to her based not only on her emotional pain and suffering and mental anguish but also for her inconvenience, her loss of enjoyment of life, and "other

73

noneconomic losses," and Boxer does not specifically challenge or discuss these other items. *Cf.* Tex. R. App. P. 38.1(i).

Based on this record, because the jury could have reasonably found that Dehnel had suffered some mental anguish that was more than "mere worry, anxiety, vexation, embarrassment, or anger," in addition to her inconvenience, her loss of enjoyment of life, and "other noneconomic losses" in its award, we overrule Boxer's fourth issue.

## IV. Back Pay

In its third issue, Boxer contends that Dehnel's $87,000 back pay award was erroneous because she had intended to quit the day she was fired. Dehnel responds that Boxer's back pay argument is an affirmative defense that Boxer failed to plead or prove and that Boxer thereby failed to preserve this complaint. Boxer replies that Dehnel's intended resignation is not an affirmative defense but that, if it is, it was tried by consent.[55]

---

[55]Both parties make additional arguments, but based on our resolution here, we need not reach them. *See* Tex. R. App. P. 47.1. Further, in its reply brief, for the first time, Boxer complains about the back pay calculation. Because Boxer did not raise this argument in its opening brief, we will not consider it. *See Kadow v. MAA, Watermark*, No. 02-22-00038-CV, 2022 WL 17841131, at *5 n.4 (Tex. App.—Fort Worth Dec. 22, 2022, no pet.) (mem. op.) (stating that the court could not consider additional issues appellant raised "for the first time in her reply brief" and that such issues were not preserved for review); *Lorant v. 2016 Parkview Condos. Dev. LLC*, No. 02-22-00032-CV, 2022 WL 16845110, at *4 n.11 (Tex. App.—Fort Worth Nov. 10, 2022, no pet.) (mem. op.) ("Arguments may not be raised for the first time in a reply brief."); *see also* Tex. R. App. P. 38.3 (stating that the appellate court may consider and decide the case before a reply brief is filed).

In its original answer to Dehnel's lawsuit, Boxer made a general denial and raised several affirmative defenses—including failure to mitigate—but it did not raise Dehnel's anticipated voluntary departure. *See Gaddy v. Abex Corp.*, 884 F.2d 312, 318 (7th Cir. 1989) (stating that failure to mitigate is affirmative defense); *Davalos v. Jacobsen Div. of Textron, Inc.*, 11 F. Supp. 2d 1012, 1019 (E.D. Wis. 1998) (same); *see also Allen v. Int'l Truck & Engine Corp.*, No. 1:02-CV-00902-RLY-MJD, 2017 WL 1382610, at *5 (S.D. Ind. Apr. 18, 2017) ("[J]ust as with the affirmative defense of failure to mitigate, an employer must bear the burden of proving that a back pay offset for a period of disability is appropriate.").

Dehnel points out that Boxer's argument here is one that would allow it to avoid the back pay damages. *See* Tex. R. Civ. P. 94 (listing "any other matter constituting an avoidance or affirmative defense"). "If an affirmative defense or avoidance is not expressly pleaded, the party cannot rely on the defense as a bar to liability." *Zorrilla v. Aypco Constr. II, LLC*, 469 S.W.3d 143, 155 (Tex. 2015); *see MAN Engines & Components, Inc. v. Shows*, 434 S.W.3d 132, 136 (Tex. 2014) (discussing purpose of Rule 94 as a rule of fairness that requires the defendant to identify affirmative defenses involving facts distinct from the elements of the plaintiff's claim so that the plaintiff may reasonably prepare to rebut or explain them). Because an affirmative defense raises additional issues of fact, Rule 94 demands that it appear in a pretrial pleading. *MAN Engines*, 434 S.W.3d at 137.

In her original petition, Dehnel alleged that she had been terminated based on sex, on age, and in retaliation for her discrimination complaints. A decision to quit before being fired might therefore—as argued by Boxer—bar an award of back pay damages. *See, e.g.*, *E.E.O.C. v. Ilona of Hung., Inc.*, 108 F.3d 1569, 1572, 1579 (7th Cir. 1997) (op. on reh'g) (reversing back pay award where evidence "uncontrovertibly" showed that employee planned to quit her job before she was fired in violation of Title VII).[56] That is, Boxer's argument shares the common characteristics of an affirmative defense—an independent reason to bar recovery made not in defense but in avoidance by "seek[ing] to add another ingredient to the mix that would defeat the [plaintiff's] claim." *MAN Engines*, 434 S.W.3d at 136–37 (explaining that because an affirmative

---

[56]Boxer cites the following constructive-discharge cases to support a related argument that back pay is not available to Dehnel—*Mallinson-Montague v. Pocrnick*, 224 F.3d 1224, 1236–37 (10th Cir. 2000), *Thorne v. City of El Segundo*, 802 F.2d 1131, 1134 (9th Cir. 1986), *Derr v. Gulf Oil Corp.*, 796 F.2d 340, 341–42 (10th Cir. 1986), and *Odima v. Westin Tucson Hotel*, 53 F.3d 1484, 1495 (9th Cir. 1995)—but Dehnel was fired before she could resign, unlike the plaintiffs in *Mallinson-Montague* and *Derr*, and she did not complain about the denial of the opportunity for a career change, unlike the plaintiffs in *Thorne* and *Odima*. In *Derr*, the Tenth Circuit explained that the no-back-pay-without-constructive-discharge rule was based on the theory that an employee who *quits* (a voluntary job departure) cannot secure back pay *unless* his employer constructively discharged him. 796 F.2d at 342. That is, the plaintiff's decision to quit and her ensuing loss of wages cannot be properly attributed to her employer without her employer's having made working conditions so intolerable as to have resulted in a constructive discharge. *Id.* at 344 ("[T]he question on which constructive discharge cases turn is simply whether the employer by its illegal discriminatory acts has made working conditions so difficult that a reasonable person in the employee's position would feel compelled to resign."). This is unlike a case in which the plaintiff is actually terminated. *See, e.g.*, *Palasota v. Haggar Clothing Co.*, 499 F.3d 474, 483 (5th Cir. 2007) ("Undisputedly then, Palasota was entitled to back pay based on the accrual of his economic damage during the period *from his termination* to the date of the trial." (emphasis added)).

defense presents a situation where a plaintiff cannot recover even if her claims are true because of some other fact that the defendant has pleaded as a bar, Rule 94 "demands that it appear in a pretrial pleading"). We conclude that Boxer should have raised—but did not raise—Dehnel's having planned to quit as an affirmative defense. If the matter was not tried by consent, then Boxer has waived this complaint. *Cf. Pulliam v. Tallapoosa Cnty. Jail*, 185 F.3d 1182, 1184–87 (11th Cir. 1999) (holding mixed-motives affirmative defense was sufficiently included in federal pretrial order, which gave the plaintiff notice).

Rule of Civil Procedure 67 provides that if an issue not raised by the pleadings is tried by the parties' express or implied consent, it "shall be treated in all respects as if [it] had been raised in the pleadings." Tex. R. Civ. P. 67. To determine whether an issue was tried by consent, we examine the record not for evidence of the issue, but rather for evidence *of trial* of the issue. *In re J.R.*, No. 02-23-00071-CV, 2024 WL 191211, at *6 (Tex. App.—Fort Worth Jan. 18, 2024, pet. denied) (mem. op.) (quoting *In re A.B.H.*, 266 S.W.3d 596, 600 (Tex. App.—Fort Worth 2008, no pet.) (op. on reh'g)). Trial by consent is a doctrine that is only intended to cover the exceptional case in which it clearly appears from the record as a whole that the parties tried the unpleaded issue; it is not intended to establish a general rule of practice and should be applied with care. *Id.*

Boxer directs us to Dehnel's direct testimony during which she discussed having told her counselor about her plan to take out a loan because she had not yet found

another job and "just wanted out of the hotel business" and having told her counselor on September 25 that her loan had come in and that she was "ready to terminate now." Boxer also directs us to Dehnel's agreeing with her counsel during her trial testimony that she had planned to quit on September 25 but that she had been terminated "a couple of hours before [she] had planned on handing in [her letter of] resignation" and that after she was terminated, she put her resignation letter on Owen's desk and said, "I was going to quit anyways." Boxer directs us to her testimony that she tried to find another job after she was terminated because she had not sufficiently researched getting a real estate license and it "just wasn't an option at that time" and that she eventually found work at another hotel six to nine months before trial.

Boxer also directs us to Dehnel's cross-examination testimony during which she testified as follows:

- When asked if she told her counselor on September 25 that she was going to quit on the day that she was actually discharged, Dehnel replied, "That is correct."

- When asked if her plan on September 25 had been to quit, have a girls' trip, see a friend, get a motorcycle license, and train to become a realtor, Dehnel replied, "Those were goals that I had set for myself, as my therapist told me I should," and she agreed that she had put the plan into motion to try to get herself "back together." Dehnel clarified that she had "probably made the decision to go on a girls' trip longer than before that because [they had] it once a year."

- Regarding her September 9 counseling notes, Dehnel agreed that she had made a plan to change her job because she "needed to change [her] job."

- Regarding her September 16 counseling notes, Dehnel agreed that she told her counselor that the loan had come in and that she was resigning in nine days, i.e., September 25.

78

"[A]n issue is not tried by consent merely because evidence regarding it is admitted." *Bos v. Smith*, 556 S.W.3d 293, 306–07 (Tex. 2018). And the doctrine of trial by consent does not apply when the evidence of an unpleaded matter is relevant to the pleaded issues because it would not be calculated to elicit an objection. *Id.* at 307. While the above may have been some evidence that Dehnel planned to quit her job, it was equally probative of *why* she felt pressure to quit and the context leading up to her termination. *See id.* (holding no trial by consent as to defamation claim when grandparent's statements to DFPS were relevant to other issues in the trial). The jury was entitled to weigh this evidence, judge Dehnel's credibility, and decide whether to award back pay as equitable relief, i.e., "that amount of wages and employment benefits that [she] would have earned if she had not been subjected to [Boxer's] unlawful conduct less any wages, unemployment compensation or workers' compensation benefits she received in the interim." The jury instruction defined "employment benefits" to include monetary losses incurred as a result of the loss of health, life, dental, or similar insurance coverage. The jury decided to award $87,000 in back pay to Dehnel. *See* Tex. Lab. Code Ann. § 21.258(a)–(c).

Further, the record reflects that on February 22, 2022, seven days before Dehnel's testimony above, Boxer submitted a proposed jury charge question on whether Dehnel had intended to quit around the time she was discharged. That instruction was not included in the charge, and Boxer did not object to its omission during the charge conference. *See* Tex. R. Civ. P. 274 ("Any complaint as to a question,

79

definition, or instruction, on account of any . . . omission, or fault in pleading, is waived unless specifically included in the objections."). Based on this record, Dehnel's plan to quit as an affirmative defense was not tried by consent. We overrule Boxer's third issue without reaching its remaining arguments. *See* Tex. R. App. P. 47.1.

## V. Exemplary Damages

In its second issue, Boxer argues that the trial court erred by entering an exemplary-damages award without a unanimous verdict.

The controversial charge provisions are as follows:

*Answer the following question only if you unanimously answered "Yes" to Question No. 1* [age discrimination], *Question No. 2* [sex discrimination] *or Question No. 3* [retaliation]. *Otherwise, do not answer the following question.*

*To answer "Yes" to the following question, your answer must be unanimous. You may answer "No" to the following question upon a vote of ten or more jurors. Otherwise, you must not answer the following question.*

**QUESTION NO. 5:**
Do you find by clear and convincing evidence that Boxer Property Management Company engaged in the discriminatory practice that you found in either Question No. 1, Question No. 2 or Question No. 3, with malice or with reckless indifference to the right of Teresa R. Dehnel to be free from such practices?

. . . .

Answer "Yes" or "No."

Answer: Yes.

The instructions for signing the verdict certificate stated:

1. Unless otherwise instructed, you may answer the questions on a vote of 10 jurors. The same 10 jurors must agree on every answer in the charge. This means you may not have one group of 10 jurors agree on one answer and a different group of 10 jurors agree on another answer.

2. If 10 jurors agree on every answer, those 10 jurors sign the verdict.

If 11 jurors agree on every answer, those 11 jurors sign the verdict.

If all 12 of you agree on every answer, you are unanimous and only the presiding juror signs the verdict.

3. All jurors should deliberate on every question. You may end up with all 12 of you agreeing on some answers, while only 10 or 11 of you agree on other answers. But when you sign the verdict, only those 10 who agree on every answer will sign the verdict.

The verdict certificate presented three options: a unanimous verdict, a nonunanimous verdict of 11, and a nonunanimous verdict of 10. The verdict form is checked by, "Our verdict is not unanimous. Eleven of us have agreed to each and every answer and have signed the certificate below."[57] Eleven jurors signed the certificate. On the record, the presiding juror agreed with the trial court's statements, "[Y]ou were not unanimous, right?" and "11 of you agreed?" Neither party asked to poll the jurors to

---

[57]Although Rule 226a has an optional instruction if a charge requires some unanimity and an additional certificate to be "[u]sed when some questions require unanimous answers" to certify that the jury was unanimous in answering particular questions and that all of the jurors agreed to each of the answers, the optional instruction and additional certificate were not used here. *See* Tex. R. Civ. P. 226a.

clarify the answers before the trial court released them. *Cf.* Tex. R. Civ. P. 294 (stating that any party shall have the right to have the jury polled).

Based on *Oscar Renda*, which presented the same unanimity problem, Boxer is entitled to prevail on this issue because "the statutory burden to obtain unanimous findings belongs to the party seeking exemplary damages, [and] that party must ensure that the charge asks questions that satisfy this requirement." 689 S.W.3d at 312–13. The burden to secure a unanimous verdict is on the plaintiff and may not be shifted. *Id.* at 307. And "[b]ecause the plaintiff bears the burden to secure unanimity, it is the plaintiff who must seek clarification to the extent that it asserts that the divided verdict inaccurately reflects the jury's vote as to a particular question." *Id.* at 311. That is, Dehnel had the burden to provide the correct jury charge on the exemplary-damages question, to object to the charge's deficiencies before submission, and to request further deliberations before the jury was discharged.[58] *See generally id.* at 307, 311–13. Because she did not do so, we sustain Boxer's second issue.

---

[58]In her appellee's brief and in a post-submission letter brief, Dehnel refers us to a juror's post-verdict sworn declaration that she attached to her response to Boxer's motion for JNOV. In the declaration, the juror purports to explain his vote that made the verdict nonunanimous. But Rule of Civil Procedure 327(b) prevents us from considering this declaration. *See* Tex. R. Civ. P. 327(b) (precluding testimony about "any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon . . . [a] juror's mind or emotions as influencing him to asset to or dissent from the verdict concerning his mental processes in connection therewith" except for any outside improper influence).

## VI. Attorney's Fees

Boxer's fifth issue and Dehnel's cross-issue pertain to her attorney's-fee award.

In its fifth issue, Boxer argues that Dehnel cannot recover attorney's fees because she is not entitled to recover on any of her claims and because the award is unreasonable, conditioning its argument on our reversal of both Dehnel's $250,000 exemplary-damages award and her $87,000 back pay award. In her single cross-issue, Dehnel argues that the trial court abused its discretion by awarding an amount of attorney's fees that was too low when compared to her evidence.

As set out above in our analysis, Dehnel was entitled to recover on her retaliation claim, and we have not reversed her back pay award. However, based on the divided jury verdict, she was not entitled to the $250,000 exemplary-damages award. We sustain Boxer's fifth issue and remand the attorney's-fee issue to the trial court for recalculation.[59] In light of this disposition, Dehnel's cross-issue on the amount of her attorney's-fee award is no longer ripe for our review. Accordingly, we do not reach the merits of her cross-issue. *See* Tex. R. App. P. 47.1.

---

[59]In its findings of fact and conclusions of law and in its amended findings of fact and conclusions of law on attorney's fees, the trial court recited that it had considered—among other things—"the amount involved and the results obtained." *See generally Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469, 498–502 (Tex. 2019); *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 818 (Tex. 1997) (op. on reh'g). It is unclear whether the trial court included the $250,000 exemplary-damages award in its calculation of the lodestar and in determining that an enhancement was not appropriate. *See Rohrmoos*, 578 S.W.3d at 500–02.

## VII. Conclusion

Having sustained Boxer's second and fifth issues, we reverse the portion of the judgment awarding $250,000 in exemplary damages and render a take-nothing judgment on exemplary damages. We also reverse the $173,250 attorney's-fee award and remand the attorney's-fee issue to the trial court for recalculation. Having overruled Boxer's first, third, and fourth issues, we affirm the remainder of the trial court's judgment.

/s/ Wade Birdwell

Wade Birdwell
Justice

Delivered: July 3, 2024